# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP2166 |
| COMPLETE TITLE: | In re the Paternity of F. T. R.: |

David J. Rosecky,
　　　　Petitioner-Appellant,
　　v.
Monica M. Schissel,
　　　　Respondent-Respondent.

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 11, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 9, 2013 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| 　COURT: | Circuit |
| 　COUNTY: | Columbia |
| 　JUDGE: | Alan J. White |

| | |
|---|---|
| JUSTICES: | |
| 　CONCURRED: | ABRAHAMSON, C.J., BRADLEY, J., concur. (Opinion filed.) |
| 　DISSENTED: | |
| 　NOT PARTICIPATING: | |

ATTORNEYS:

For the petitioner-appellant, there were briefs by *Stephen W. Hayes* and *Anissa M. Boeckman* and *Grady, Hayes & Neary, LLC*, Waukesha, with oral argument by *Stephen Hayes*.

For the respondent-respondent, there was a brief by *Richard J. Auerbach* and *Auerbach & Porter, S.C.*, Madison, and oral argument by *Richard J. Auerbach*.

For the guardian ad litem, there was a brief by *Todd J. Hepler*, Lodi, and oral argument by *Todd J. Hepler*.

An amicus curiae brief was filed by *Richard E. Schoenbohm*, Appleton, on behalf of the American Academy of Adoption Attorneys/American Academy of Assisted Reproductive Technology Attorneys.

An amicus curiae brief was filed by *Andrea Lea Olmanson*, Madison, on behalf of Concerned United Birthparents, Inc.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2011AP2166
(L.C. No. 2010PA42PJ)

STATE OF WISCONSIN      :      IN SUPREME COURT

In re the Paternity of F. T. R.:

David J. Rosecky,

    Petitioner-Appellant,

    v.

Monica M. Schissel,

    Respondent-Respondent.

**FILED**

**JUL 11, 2013**

Diane M. Fremgen
Clerk of Supreme Court

APPEAL from an order of the Columbia County Circuit Court, Alan J. White, Judge. *Reversed and cause remanded for proceedings consistent with this opinion.*

¶1 ANNETTE KINGSLAND ZIEGLER, J. This appeal is before the court on certification by the court of appeals, pursuant to Wis. Stat. § 809.61 (2009-10).[1] David and Marcia Rosecky (the Roseckys) entered into a Parentage Agreement (PA or the

---

[1] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

agreement) with Monica and Cory Schissel (the Schissels) whereby the parties agreed that Monica Schissel (Monica) would become pregnant and carry a child for the Roseckys. The agreement provided that "[the Roseckys] shall be the legal parents of [the] Child," that the "Child's best interests will be served by being in [the Roseckys'] legal custody and physical placement," and that "[t]he parties will cooperate fully in any parentage proceedings to determine [the Roseckys] as [the] [C]hild's legal parents, . . . including but not limited to termination of parental rights and adoption." Monica became pregnant through artificial insemination using her egg and David Rosecky's (David) sperm. On March 19, 2010, Monica gave birth to F.T.R. Shortly before F.T.R.'s birth, Monica informed the Roseckys she no longer wanted to give up her parental rights. She further sought custody and placement of F.T.R. David responded by seeking enforcement of the PA. The Columbia County Circuit Court, Judge Alan J. White, determined that the PA was not enforceable, and after a trial, awarded sole custody of F.T.R. to David, primary placement to David, and secondary placement to Monica. David appealed, seeking enforcement of the PA and sole custody and placement of F.T.R. The court of appeals certified to this court the question of "whether an agreement for the traditional surrogacy and adoption of a child is enforceable."

¶2 We granted the court of appeals' certification and now reverse the order of the circuit court.

¶3 Aside from the termination of parental rights provisions in the PA at issue, we conclude a PA is a valid,

2

enforceable contract unless enforcement is contrary to the best interests of the child. While the traditional defenses to the enforcement of a contract could apply, none appear to render the entire PA in this case unenforceable.

¶4 We also conclude that the circuit court erroneously exercised its discretion by excluding the PA and rendering its custody and placement decision without consideration of the PA. We reverse the circuit court's determination that the PA is unenforceable and remand for a hearing on custody and placement, wherein the terms of the PA are enforced unless enforcement is contrary to the best interests of F.T.R.

## I. FACTUAL BACKGROUND

¶5 Marcia and Monica were good friends for many years, having met in grade school. Each participated in the other's wedding. The Roseckys were godparents to the Schissels' youngest daughter.

¶6 In 2004, and again in 2008, Marcia was diagnosed with leukemia. After receiving treatments, she is currently in good health and the doctors consider the leukemia "a nonissue." However, her eggs are no longer viable and she is unable to have biological children.

¶7 In 2004, and again in 2008, Monica offered to act as a surrogate for the Roseckys. Monica testified that she wanted to help the Roseckys: "I was [Marcia's] friend. I offered to do this. . . . I orchestrated this whole thing. This whole thing was my doing. I offered. I carried. I said I would do it." In 2008, the Roseckys accepted Monica's offer. The parties

3

discussed using a donor egg, but decided to use Monica's egg because they could be sure of Monica's family history, there was a higher chance of having multiples using a donor egg, and Monica preferred to use her own egg. Marcia expressed concern that Monica would have trouble giving up her biological child, but Monica reassured Marcia that she would allow the Roseckys to raise the child.

¶8 The parties had extensive conversations about the legal ramifications of the surrogacy before Monica became pregnant. The parties discussed and agreed that Monica and the child would have no legal relationship, Monica would not have formal custody and placement of the child, Monica would see the child through informal social visits, and the Roseckys would raise the child. Both parties retained counsel, and the attorneys reduced the agreement to writing. The parties negotiated terms in the agreement, and sent revised drafts back and forth. The parties acknowledge that the written agreement is an accurate reflection of the discussions they had before Monica became pregnant. Monica became pregnant in June 2009 through artificial insemination using her egg and David's sperm.

¶9 On November 7, 2009, the agreement was signed by David as the "father," and Marcia as the "mother." On November 17, 2009, the agreement was also signed by Monica as the "carrier," and Cory Schissel (Cory) as the "husband." The attorneys for both parties also signed the agreement.

¶10 Most importantly for this opinion, the PA contains the parties' agreement as to parentage, legal custody, and physical placement.[2]

¶11 Cory and Monica have five children together. Before Monica became pregnant with F.T.R., the Schissels did not intend to have any more children; to that end, Cory had a vasectomy.

¶12 Toward the end of the pregnancy, the parties had a falling out. It suffices to say that there were several events resulting in hurt feelings and lack of trust among the parties. In any event, shortly before F.T.R. was born, Monica reneged on the PA and refused to terminate her parental rights. On March 19, 2010, Monica gave birth to F.T.R. and allowed F.T.R. to go home with the Roseckys from the hospital.

## II. PROCEDURAL POSTURE

¶13 Shortly after F.T.R. was born, the Columbia County Circuit Court appointed the Roseckys as the temporary guardians

---

[2] The agreement contains other provisions, including: Monica's consent to serve as a traditional surrogate; the procedure by which Monica would be inseminated; the Schissels' acknowledgement and assumption of risk; the Roseckys' acknowledgement and assumption of parental responsibility; medical supervision, counseling, and carrier conduct relating to the pregnancy; provisions for a medically-necessary abortion; Cory's waiver of rights and responsibilities; the Roseckys' agreement to pay enumerated expenses as a result of the pregnancy; the parties' agreement if the pregnancy were to result in a stillbirth or a miscarriage; the Schissels' agreement to maintain health insurance; contingencies if one or both of the Roseckys were to die; consequences of breach and procedures for notice; conclusive presumptions; acknowledgement of advice of counsel; severability; dispute resolution; and jurisdiction, venue, and controlling law.

of F.T.R.[3]   On May 13, 2010, David filed a separate paternity action in the Waukesha County Circuit Court.  On August 2, 2010, Judge Lee S. Dreyfus Jr. adjudicated David to be the father of F.T.R. and transferred the remaining issues to Columbia County to be joined with the existing guardianship case.  On September 30, 2010, Monica moved the circuit court for increased custody and placement of F.T.R.  David moved for specific performance of the PA, pointing to language in the PA that Monica had waived her right to custody and placement of F.T.R.

¶14 The circuit court scheduled two hearings: one to determine interim custody and placement and one to determine the enforceability of the PA.  On November 18, 2010, the court held a hearing to determine custody and placement.  After hearing testimony from Monica, David, and Marcia, the court determined that it was in F.T.R.'s best interests to maintain the status quo: primary custody and placement with David and two hours of placement per month with Monica.

¶15 The parties then briefed the enforceability of the PA. On February 8, 2011, the court held a hearing and determined that the PA was not enforceable.  It entered an order to that effect on the same date.  The court made several findings regarding the PA.  First, it found that "[t]he contract, on its face is clear and unambiguous."  Second, the court rejected

---

[3] The appellate record does not contain original documents relating to the guardianship action in Columbia County. Documents in this record indicate that an order dated May 28, 2010, granted Monica two hours of placement with F.T.R. per month.

Monica's argument that the PA lacked consideration because she was already pregnant at the time the agreement was signed. Third, the court made additional findings about the PA:

> The parties are each represented by counsel, and were at the time the agreement was drawn. The agreement itself covers virtually every eventuality which could possibly occur during the pregnancy.

> There is no claim here by [Monica] that she did not understand the contract when she signed it. Indeed, to a great extent, it appears it was her idea to act as a surrogate in the first instance.

> Had [Monica] gone through with the termination of her parental rights, this Court would have no problem upholding the agreement . . . .

However, the court articulated the main issue as "whether the Court can, under these circumstances, force or require the mother to terminate her parental rights." The court determined that it could not force or require Monica to terminate her parental rights because the requirements of Wis. Stat. § 48.41, governing voluntary consent to a termination of parental rights (TPR), were not met. In the same vein, the court also refused to enforce the custody and placement provisions of the PA. The court did not consider the severability clause of the PA.

¶16 On February 16, 2011, in anticipation of the custody and placement trial, the court ordered Dr. Beth B. Huebner to complete a custody study to evaluate F.T.R.'s best interests. See Wis. Stat. § 767.405(14). On February 18, 2011, the court entered an interim placement order giving David primary placement and Monica placement of F.T.R. for three hours every other Saturday.

7

¶17 On April 6, 2011, Dr. Huebner filed her report. Her ultimate recommendation was that David should have full custody and placement of F.T.R., and Monica should not have any placement. On April 25, 2011, F.T.R.'s guardian ad litem, Krista E. Miller, filed her report, similarly concluding that David should have full custody and placement, and Monica should not have any placement.

¶18 On July 5 and 6, 2011, the court held a trial to determine F.T.R.'s best interests with regard to custody and placement under Wis. Stat. § 767.41. The court heard testimony from David, Marcia, Monica, Cory, Dr. Huebner, Dr. Kenneth H. Waldron (hired by the Roseckys to review Dr. Huebner's report), and Dr. Patrick T. Kane (hired by the Schissels to recommend possible steps to develop a healthy attachment between a parent and a child).

¶19 Dr. Huebner testified that it was in F.T.R.'s best interests to have full custody and placement with the Roseckys. She testified that F.T.R. was attached to Marcia, and to displace that attachment could have disastrous consequences. She testified that placement with Monica would be harmful to F.T.R. because of Monica's desire to be his mother and to replace Marcia, which would be confusing for F.T.R. Monica admitted that she referred to herself as "Mom" in interactions with F.T.R. and that she was "seeking to have placement that would allow me to act as his mother." Dr. Huebner testified that the relationship between the Roseckys and the Schissels was essentially dead; a fact to which all of the parties agreed.

8

She testified that allowing Monica to have placement in the current situation——which Dr. Huebner characterized as "beyond high conflict" even though the parties did not swear or yell at each other——would have a negative effect on F.T.R.

¶20 Dr. Waldron testified that Dr. Huebner did use the appropriate methodology in gathering data, making findings, and incorporating social science research in her report. Further, Dr. Waldron testified about disrupted secure detachment——where a young child is separated from a caregiver to whom he or she has formed an attachment——and the consequences thereof, including depression, anxiety, mental health problems, behavioral problems, delinquency, trouble maintaining long-term friendships and relationships, and increased thoughts of suicide.

¶21 Dr. Kane testified that a child can form more than one attachment, that a new attachment can be formed through a series of increased contacts, but that he did not interview the parties and did not have recommendations specific to this case. Dr. Kane's discussion assumed that the contact was in the best interests of the child. Dr. Kane also discussed that a hostile relationship between parents has negative effects on children, and that Monica's desire to be F.T.R.'s mother could result in anxiety and confusion for F.T.R.

¶22 Marcia, David, Monica, and Cory all testified about the tense relationship between the families. From the Roseckys' perspective, Monica offered to be a surrogate so the Roseckys could start a family, Monica was not abiding by the terms of the agreement, and the Roseckys agreed to use Monica's egg only

9

after she reassured the Roseckys she could allow them to raise the child. From the Schissels' perspective, Monica was being shut out and was not able to visit F.T.R. through social interactions as she had imagined. A precise retelling of the testimony at trial is not necessary for the legal analysis, but it suffices to say that the parties testified about many instances of failed communication, hurt feelings, and tense interactions.

¶23 During David's testimony, the court refused to admit the PA as an exhibit and stated that "it's not going to consider it." David's attorney, Steven W. Hayes, argued that the PA contained a severability clause, that the court could sever any provisions that it found offensive, and that the PA was relevant to several factors in custody and placement under Wis. Stat. § 767.41(5).

¶24 On August 25, 2011, the circuit court awarded sole custody and primary placement of F.T.R. to David and secondary placement to Monica. The court awarded Monica six hours of placement every other weekend until F.T.R. turned two (March 2012), and at that time, Monica was awarded an overnight stay from Friday evening until Saturday evening every other weekend. The court did not consider the PA in any way, but instead relied solely on Wis. Stat. § 767.41 to determine custody and placement. The court reasoned that under Wis. Stat. § 767.41(4)(b), both families were entitled to placement unless "the court finds that physical placement with a parent would endanger the child's physical, mental or emotional health." By

granting placement with Monica, the court rejected the expert testimony and the guardian ad litem's opinion that the tension between the parties and the separation from attachment figures could endanger F.T.R.'s mental or emotional health: "The possibility that difficulties may occur and that allowing the Schissels to play a role in the child's life is a risk. But risks are a part of life." The court rejected Dr. Huebner's opinion that this case was "beyond high conflict," because high conflict cases are those in which "the parties simply can't resist the temptation to do anything and everything to subvert, attack, demean and literally try to destroy the child's relationship with the other parent." The court noted that the contact between the families was generally civil, that it hoped "cordial transitions can be accomplished and that cordiality may develop into friendly transitions," and that F.T.R. would have the benefit of five half siblings if Monica received placement.

¶25 On September 13, 2011, David filed a notice of appeal of (1) the circuit court's February 8, 2011, ruling that the PA was unenforceable, and (2) the circuit court's August 25, 2011, order granting Monica periods of physical placement. Additionally, on September 13, 2011, David filed a motion to stay the circuit court's August 25, 2011, ruling on placement pending appeal. On October 6, 2011, the court of appeals denied David's motion to stay pending appeal.

¶26 The parties and the guardian ad litem filed briefs in the court of appeals. On August 9, 2012, the court of appeals certified to this court the question of "whether an agreement

11

for the traditional surrogacy and adoption of a child is enforceable." The court noted that "Wisconsin currently does not have legislative or common law that addresses the enforceability of a surrogacy agreement."

¶27 On September 27, 2012, we accepted the court of appeals' certification.

### III. STANDARD OF REVIEW

¶28 The PA at issue is analyzed in terms of whether it is a valid, enforceable contract. Where the material facts are undisputed, the existence of a valid, enforceable contract is a question of law, which we review de novo. See Schlosser v. Allis-Chalmers Corp., 86 Wis. 2d 226, 244, 271 N.W.2d 879 (1978); VanHierden v. Swelstad, 2010 WI App 16, ¶11, 323 Wis. 2d 267, 779 N.W.2d 441.

¶29 As for the custody and placement issue, the circuit court typically has discretion to make a determination of what is in a child's best interests. See Wis. Stat. § 767.41(5); Jocius v. Jocius, 218 Wis. 2d 103, 110-11, 580 N.W.2d 708 (Ct. App. 1998) (quoting Koeller v. Koeller, 195 Wis. 2d 660, 663-64, 536 N.W.2d 216 (Ct. App. 1995); Hollister v. Hollister, 173 Wis. 2d 413, 416, 496 N.W.2d 642 (Ct. App. 1992). We will sustain the circuit court's discretionary determination unless it constitutes an erroneous exercise of discretion. Lubinski v. Lubinski, 2008 WI App 151, ¶5, 314 Wis. 2d 395, 761 N.W.2d 676; Bohms v. Bohms, 144 Wis. 2d 490, 496, 424 N.W.2d 408 (1988); Barstad v. Frazier, 118 Wis. 2d 549, 554, 348 N.W.2d 479 (1984). A reviewing court will sustain the circuit court's exercise of

12

discretion if it examined the relevant facts, applied a proper standard of law, and came to a reasonable conclusion using a demonstrated and rational process. See Loy v. Bunderson, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982); Bohms, 144 Wis. 2d at 496.

## IV. ANALYSIS

¶30 Aside from the termination of parental rights provisions in the PA at issue, we conclude a PA is a valid, enforceable contract unless enforcement is contrary to the best interests of the child. While the traditional defenses to the enforcement of a contract could apply, none appear to render the entire PA in this case unenforceable.[4]

¶31 We also conclude that the circuit court erroneously exercised its discretion by excluding the PA and rendering its custody and placement decision without consideration of the PA. We reverse the circuit court's determination that the PA is unenforceable and remand for a hearing on custody and placement, wherein the terms of the PA are enforced unless enforcement is contrary to the best interests of F.T.R.

¶32 Section IV. A. of this opinion discusses the background of surrogacy, Section IV. B. discusses whether the Wisconsin Statutes provide guidance to our analysis, Section

---

[4] Even though the TPR provisions in the PA are not enforceable, the remaining portions of the PA can be enforced if severing the unenforceable portion does not defeat the primary purpose of the bargain. See Simenstad v. Hagen, 22 Wis. 2d 653, 662, 126 N.W.2d 529 (1964).

IV. C. discusses the enforceability of the PA, and Section V. discusses the need for legislative action in this area.

A. Background on Surrogacy

¶33 Assisted reproductive technology (ART) has created ways for people to have children regardless of their reproductive capacity: "ART, in particular surrogacy arrangements, forces us to confront deeply held beliefs about what makes a 'mother' or a 'father,' . . . and perhaps most fundamentally, what makes a 'family.'" Darra L. Hofman, "Mama's Baby, Daddy's Maybe:" A State-By-State Survey of Surrogacy Laws and Their Disparate Gender Impact, 35 Wm. Mitchell L. Rev. 449, 450 (2009).

¶34 In general terms, surrogacy "is the process by which a woman makes a choice to become pregnant and then carry to full term and deliver a baby who, she intends, will be raised by someone else." Thomas J. Walsh, Wisconsin's Undeveloped Surrogacy Law, Wisconsin Lawyer, Mar. 2012, at 16. See also Black's Law Dictionary 1458 (7th ed. 1999) (defining "surrogate mother" as "[a] woman who carries a child to term on behalf of another woman and then assigns her parental rights to that woman and the father"). This opinion will refer to the woman who

carries the baby as the "surrogate."[5] An "intended parent" is "an individual, married or unmarried, who manifests the intent . . . to be legally bound as the parent of a child resulting from assisted or collaborative reproduction." American Bar Association Model Act Governing Assisted Reproductive Technology (ABA Model Act) § 102(19) (Feb. 2008). The Roseckys are the intended parents of F.T.R.

¶35 There are two broad categories of surrogacies, traditional and gestational, but there are many permutations within those categories. In a traditional surrogacy, the surrogate is the genetic mother of the child and is artificially inseminated with the sperm of the intended father or a sperm donor. See Walsh, supra, at 16. In a gestational surrogacy, the surrogate is not genetically related to the child; instead, "sperm is taken from the father (or from a donor) and an egg is taken from the mother (or from a donor), fertilization happens outside the womb (called in vitro fertilization), and the fertilized embryos are then implanted into the surrogate mother's uterus." Id. The case before the court involves a traditional surrogacy, as Monica was artificially inseminated with David's sperm.

---

[5] There are several terms for the woman who carries the baby, including "surrogate," "gestational mother," or "gestational carrier." See American Bar Association Model Act Governing Assisted Reproductive Technology (ABA Model Act) § 102(16) (Feb. 2008) (defining "gestational carrier" as "an adult woman, not an intended parent, who enters into a gestational agreement to bear a child, whether or not she has any genetic relationship to the resulting child").

15

¶36 Parties contemplating a surrogacy will often enter into a surrogacy agreement. Id. at 18. This agreement typically outlines the parties' rights and responsibilities throughout the surrogacy process. Common provisions include contemplated medical procedures, contingencies in case of medical complications, compensation, parental rights and responsibilities, choice of law, and the parties' intent.

¶37 The ability to create a family using ART has seemingly outpaced legislative responses to the legal questions it presents, especially the determination of parentage. See Mark Hansen, As Surrogacy Becomes More Popular, Legal Problems Proliferate, ABA Journal, Mar. 2011, at 54. Historically, there have been no significant questions of maternity: the woman who gave birth to a child was the child's mother. See Charles P. Kindregan, Jr., Considering Mom: Maternity and the Model Act Governing Assisted Reproductive Technology, 17 Am. U. J. Gender Soc. Pol'y & L. 601, 605 (2009). Indeed, Monica is the mother of F.T.R. and has the commensurate parental rights. See Wis. Stat. § 48.02(13) (defining "parent" as "a biological parent, a husband who has consented to the artificial insemination of his wife [], or a parent by adoption"). Conversely, paternity could be established in multiple ways. See, e.g., Wis. Stat. § 767.89 (paternity judgment); § 767.84(1m) (rebuttable presumption when genetic testing shows probability of paternity of 99 percent or greater); § 767.805 (voluntary acknowledgment of paternity); § 891.41 (presumption of paternity based on marriage of the parties). With surrogacy, relevant parties could include the

16

genetic mother, genetic father, intended parents, the surrogate, and the surrogate's husband.

¶38 The vast majority of states do not have statutory provisions addressing surrogacy.[6] Many courts have encountered issues surrounding surrogacy, and the cases often involve ad hoc procedures attempting to effectuate the parties' intent by analyzing surrogacy issues under the state's statutes for TPR, adoption, custody and placement, and the like. See generally Rachel M. Kane, Cause of Action for Determination of Status as Legal or Natural Parents of Children Borne by Surrogate or Gestational Carrier, 48 COA 2d 687 (Jun. 2011). At oral argument, counsel for the Roseckys explained that surrogacy is a reality in Wisconsin and that Wisconsin attorneys attempt to effectuate the parties' intent in a surrogacy. Clearly, when the parties follow the agreement and everything goes as planned, the court's involvement is quite limited. For example, if the surrogate agrees to terminate her parental rights, the intended parents can adopt the child. See Wis. Stat. § 48.41 (voluntary consent to TPR); Wis. Stat. § 48.82 (persons eligible to adopt a minor child); Wis. Stat. § 48.91 (if prerequisites are met, court shall grant adoption if it is in the best interests of the child). A court will often adjudicate the intended biological

---

[6] Darra L. Hofman, "Mama's Baby, Daddy's Maybe:" A State-By-State Survey of Surrogacy Laws and Their Disparate Gender Impact, 35 Wm. Mitchell L. Rev. 449, 454-60 (2009) (state-by-state survey of surrogacy laws); Brief of Amicus Curiae American Academy of Adoption Attorneys & American Academy of Assisted Reproductive Technology Attorneys, Appendix 001-012 (same).

parent as the biological parent of a child, as David was adjudicated to be F.T.R.'s father. The adjudicated parent may then seek custody and placement of the child. Counsel for David also noted that some Wisconsin circuit courts have used Wis. Stat. § 69.14(1)(h) to make a determination of parentage for the intended mother and intended father.[7] When the parties do not agree, however, the courts are forced to confront issues of the most difficult nature.

¶39 Given this general background, we turn to Wisconsin law for guidance in answering whether the PA is enforceable.

### B. Wisconsin Law

¶40 The Wisconsin Statutes do not provide a specific answer as to whether the PA is enforceable, and they do not contain a statement of public policy against enforcement.

¶41 One statutory provision seems to contemplate some level of relief for intended parents:

> If the registrant of a birth certificate under this section is born to a surrogate mother, information about the surrogate mother shall be entered on the birth certificate and the information about the father shall be omitted from the birth certificate. If a court determines parental rights over the registrant, the clerk of court shall report the court's determination to the state registrar . . . . Upon receipt of the report, the state registrar shall prepare and register a new birth

---

[7] In this unique case neither of the common routes that David's attorney explained provided a complete remedy for the parties because the two biological parents were contesting custody and placement. Thus, the parties instituted guardianship and custody and placement proceedings. See Wis. Stat. ch. 54; Wis. Stat. § 767.41(1)(b).

18

certificate for the registrant under s. 69.15(6) and send a copy of the new certificate to the local registrar who filed the original certificate. Upon receipt of the copy, the local registrar shall destroy his or her copy of the replaced certificate and file the new certificate.

Wis. Stat. § 69.14(1)(h). "Registrant" is defined as "the subject of a certificate or declaration which a local registrar has accepted for filing in the system of vital statistics." Wis. Stat. § 69.01(19). This section seems to contemplate that a court may make a determination of parental rights to someone other than the "surrogate mother."

¶42 Wisconsin Stat. § 891.40 provides that if certain procedures are followed when a woman is inseminated with sperm from a sperm donor, the woman's husband at the time of conception "shall be the natural father of a child conceived." Wis. Stat. § 891.40(1). Further, the statute provides that the sperm donor "bears no liability for the support of the child and has no parental rights with regard to the child." Wis. Stat. § 891.40(2).

¶43 The Wisconsin Statutes also govern more typical custody and placement situations, but the statutes do not specifically contemplate the use of a surrogacy parenting agreement in the adjudication of custody and placement disputes. See Wis. Stat. ch. 767. The statutes specify that a circuit court shall make custody and placement determinations in certain enumerated actions affecting the family. See Wis. Stat. § 767.41(1)(b) (annulment, divorce, legal separation, adjudicated paternity, custody, compelled support, acknowledged

19

paternity).  Surrogacy is not one of those enumerated actions. In a more typical custody and placement determination, where there is no PA, the court "shall consider all facts relevant to the best interest of the child."  Wis. Stat. § 767.41(5).  The statute enumerates 16 factors that the court shall consider. Id.  As the circuit court noted, many of the statutory factors are difficult to apply to the facts surrounding a surrogacy:

> One of the striking things to the court in this case is how many factors in § 767.41 don't apply. . . . The interaction of each parent has wholly been affected by [Monica's] relinquishment of the child and the orders of this court and earlier agreements of the parties.  The amount and quality of time with the parent.  Same analysis.  The child's adjustment to home.  Same analysis.  The need for regularly occurring and meaningful periods of placement.  So far, same analysis.  In many respects it doesn't quite seem to fit into the usual analysis in family court.  That is because of course this case is so unusual.

¶44 Adoption and termination of parental rights are also governed by the Wisconsin Statutes, but do not appear to contemplate the issues surrounding a surrogacy.  Adoption is available when both of the parents are deceased, the parental rights of both parents have been terminated, the parental rights of one parent have been terminated and the stepparent seeks to adopt, or the parental rights of one parent have been terminated and the other parent is deceased.  See Wis. Stat. § 48.81. Parental rights can be terminated voluntarily, see Wis. Stat. § 48.41, or involuntarily if grounds for the termination exist. See § 48.415 (grounds include abandonment, continuing need of protection or services, continuing parental disability, and

20

abuse).  The TPR-and-adoption scheme does not provide relief for a party in Marcia's circumstance: she is the wife of the biological father, she currently has no parental rights over the child, the surrogate/egg donor refuses to voluntarily terminate her parental rights, and there are no facts in the record to indicate that there would be grounds to terminate the surrogate's parental rights.

¶45 Further, adoption is distinctly different than surrogacy.  Adoption often occurs in circumstances where the parent cannot or will not care for the child.  Substantial court oversight is necessary in a voluntary-TPR-and-adoption scenario to ensure that the biological parents have consented to the TPR after being informed of the consequences thereof.  See Wis. Stat. § 48.41.  In contrast, surrogacies are planned, and the intended parents want the child and are willing and able to care for the child.  Additionally, the Wisconsin Statutes prohibit the proposed adoptive parents from making certain payments to the birth mother, for fear of causing undue influence or encouraging "baby-selling."  See Wis. Stat. § 48.913(4).  On the other hand, surrogacies may not present the same concerns for undue influence because the surrogate is often a good friend or family member of the intended parents, or, if the parties use a surrogacy agency, the surrogate is likely screened by the agency.  See Hansen, supra, at 56-57 (reporting that a reputable surrogacy agency screens surrogates and "manage[s] all of the medical, psychological, legal, financial, insurance, and administrative details that go along with such an arrangement").

21

¶46  In this case, Monica was presumed to be the mother of F.T.R. because she gave birth to him, David was adjudicated as the father of F.T.R., the circuit court determined that the PA was unenforceable, and Monica is unwilling to voluntarily terminate her parental rights.  Under the current statutory schemes, Marcia is left without any parental rights unless and until Monica's parental rights are terminated and Marcia adopts F.T.R.:

> It is clear that the more complex surrogacy relationships do not easily fit into Wisconsin's statutory scheme.  The statutes do not refer to compensation of surrogate mothers or sperm and egg donors.  No provisions address the interests of the child created in this process or by in vitro fertilization.  Thus, parties seeking relief in Wisconsin courts are provided no guarantee that relief can be had.  Further, circuit court judges attempting to determine if relief is appropriate are given no guidance on how to apportion that relief.

Walsh, supra, at 19.  Considering the facts of this case, none of the statutory schemes neatly answer the multiple legal issues presented.

¶47  In summary, the Wisconsin Statutes do not provide a specific answer as to whether the PA is enforceable, and they do not contain a statement of public policy against enforcement.

### C. Enforceability of the PA

¶48  Having determined that the Wisconsin Statutes do not provide a specific answer regarding the enforceability of the PA, we turn to contract law.  As such, we will analyze whether this contract satisfies the elements of a contract, and whether

22

there are any defenses that render this contract unenforceable. First, however, we address the parties' arguments.

### 1. Parties Arguments

¶49  David makes several arguments as to why the PA should be enforceable.  First, David argues that the PA is enforceable under contract law and that public policy does not invalidate the PA.  Indeed, David argues that public policy supports the enforcement of the PA, as it provides stability and predictability for children and for parties to surrogacies. David looks to case law and statutes from other jurisdictions that have enforced surrogacy contracts or otherwise concluded that the intended parents are the legal parents of the child. David alternatively argues that the PA should be enforced under equitable estoppel because the Roseckys relied on Monica's representations that she would be able to separate herself from the child, and they would not have gone through with the surrogacy but for those representations.

¶50  David further argues that the circuit court failed to consider the severability clause in the PA when addressing the TPR provisions.  The circuit court framed the issue of enforceability as "whether the court can, under these circumstances, force or require the mother to terminate her parental rights."  However, David argues that it is not necessary to terminate Monica's parental rights to effectuate the parties' overall intent——for the Roseckys to be the parents of F.T.R., with full custody and placement.  Therefore, any

23

offending portion of the PA can be severed, and the remaining portions can be used to enforce the parties' intent.

¶51 Finally, David argues that, at the very least, the PA should have been received into evidence and considered as a factor in custody and placement. David argues that the PA is relevant to several factors under Wis. Stat. § 767.41(5)(am), especially subdivision 1. because the PA is evidence of the "wishes of the child's parent or parents" or is a "legal custody or physical placement proposal submitted to the court."

¶52 F.T.R.'s guardian ad litem on appeal, Todd J. Hepler, argues that, absent some showing of unconscionability, a surrogacy contract should be presumptively enforceable as long as it is in the best interests of the child. The guardian ad litem argues that the best way to promote stability and predictability is to presumptively enforce surrogacy agreements:

> In the case of a last-minute surrogacy repudiation, once a child is born, the parties will be forced [to] instigate an immediate whirlwind of litigation concerning placement and custody of the child and the newborn's first days, weeks, months and years of life will be clouded by the atmosphere of tension, anxiety and angst incumbent with bitter litigation of this sort.

The guardian ad litem looks to the legislature's pronouncement that "instability and impermanence in family relationships are contrary to the welfare of children." Wis. Stat. § 48.01(1)(a).

¶53 Monica looks to a myriad of Wisconsin Statutes and cases to conclude that the PA cannot be enforceable. She argues that the PA violates Wis. Stat. § 48.913, which prohibits

24

certain payments in an adoption, because the PA provides illegal payments to Monica and Cory.  She argues that parents cannot contract to create parental rights[8] and that custody and placement agreements are not binding on the parties until they are approved by a court.[9]  Wis. Stat. § 767.34(1) (requiring court approval to stipulations for "legal custody and physical placement" in "an annulment, divorce, or legal separation").  Monica further argues that her refusal to follow through with the PA precludes its enforcement.  See Hottenroth v. Hetsko, 2006 WI App 249, ¶13, 298 Wis. 2d 200, 727 N.W.2d 38 (parties to a divorce "are free to withdraw from a stipulation until it is incorporated into the divorce judgment") (internal quotation omitted).  She argues that custody and placement orders cannot be "fixe[d]" such that there can be no modification of the order in the future and cannot be contingent on a future event.  See Jocius, 218 Wis. 2d at 118 ("[T]he statute permitting a trial

---

[8] See Sporleder v. Hermes, 162 Wis. 2d 1002, 471 N.W.2d 202 (1991), overruled by Holtzman v. Knott, 193 Wis. 2d 649, 690-91, 533 N.W.2d 419 (1995).  Though the contract in Holtzman did not attempt to transfer custody, the court stated that "[n]othing in ch. 767 expressly prohibits contracts relating to visitation" and that "public policy considerations do not prohibit a court from relying on its equitable powers to grant visitation apart from [sec. 767.41] on the basis of a co-parenting agreement between a biological parent and another when visitation is in a child's best interest.  We overrule any language in [Sporleder] to the contrary."  193 Wis. 2d at 690-91.

[9] By its terms, Wis. Stat. § 767.34 is applicable only to actions for "an annulment, divorce, or legal separation."  Monica argues that the requirement in § 767.34——that a court approve the parties' stipulation as to custody and placement——is applicable to paternity actions by § 767.89(3)(b).

25

court to deny a parent physical placement does not permit the trial court to make a prospective order prohibiting a parent from requesting a change in physical placement in the future."); Culligan v. Cindric, 2003 WI App 180, ¶13, 266 Wis. 2d 534, 669 N.W.2d 175 ("It is well settled that a circuit court lacks the statutory authority at divorce to order a change of physical placement that is both prospective and contingent on the occurrence of some anticipated event.").

¶54 Monica argues that the PA violates Wis. Stat. § 767.41(5)(am) because it precludes a court from considering all statutory factors in a custody and placement determination. Monica argues that enforcement of the PA violates Wis. Stat. § 767.41(4)(b), which provides that a court can preclude placement with a parent only after a hearing and after determining that the placement would "endanger the child's physical, mental or emotional health." Finally, Monica argues that blind enforcement of the PA violates the overarching principle of custody and placement determinations, that the child's best interests must dictate any agreement or order. See Wis. Stat. § 767.41(5) ("[T]he court shall consider all facts relevant to the best interest of the child.").

### 2. Contract Law

¶55 Aside from the termination of parental rights provisions, we conclude the PA is a valid, enforceable contract unless enforcement is contrary to the best interests of the F.T.R. While the traditional defenses to the enforcement of a contract apply, none have been presented to render the PA

26

unenforceable. We do not accept David's argument that the PA is wholly enforceable. In fact, the portions of the PA calling for the termination of Monica's parental rights are unenforceable. We also do not accept Monica's assertion that the PA is wholly unenforceable. The main problem with Monica's arguments is that they are based on law that was never intended to govern the various issues presented in a surrogacy. The law does not specifically address the legal issues presented in this surrogacy dispute.

¶56 Despite this being a unique contract, we turn to contract law for guidance. "Wisconsin courts have long recognized the importance of freedom of contract and have endeavored to protect the right to contract." Watts v. Watts, 137 Wis. 2d 506, 521, 405 N.W.2d 303 (1987). A founding principle of freedom of contract is that "individuals should have the power to govern their own affairs without governmental interference." Merten v. Nathan, 108 Wis. 2d 205, 211, 321 N.W.2d 173 (1982). Courts protect parties' "justifiable expectations and the security of transactions" by "ensuring that the promises will be performed." Id.

¶57 The elements of a contract are offer, acceptance, and consideration. See Goossen v. Estate of Standaert, 189 Wis. 2d 237, 247, 525 N.W.2d 314 (Ct. App. 1994); Michael B. Apfeld et al., Contract Law in Wisconsin § 2.1 (3d ed. 2012). Defenses to the enforcement of a contract include misrepresentation, mistake, illegality, unconscionability, void

against public policy, duress, undue influence, and incapacity. See Apfeld et al., supra, at ch. 3.

¶58 Even if a contract contains an illegal provision, "Wisconsin has long accepted that a portion of a contract may be severable." Markwardt v. Zurich Am. Ins. Co., 2006 WI App 200, ¶30, 296 Wis. 2d 512, 724 N.W.2d 669. A severability clause, though not controlling, is entitled to great weight in determining if the remaining portions of a contract are severable. See Town of Clearfield v. Cushman, 150 Wis. 2d 10, 24, 440 N.W.2d 777 (1989) (internal quotation omitted). If a contract contains an illegal clause, the remaining portions of the contract can be enforced if severing the illegal portions does not defeat the primary purpose of the bargain. See Simenstad v. Hagen, 22 Wis. 2d 653, 662, 126 N.W.2d 529 (1964); Baierl v. McTaggart, 2001 WI 107, ¶¶15, 18, 245 Wis. 2d 632, 629 N.W.2d 277.

¶59 In this case, there is no question that the PA contains the essential elements of a contract. Monica made an offer to the Roseckys that she would act as a surrogate. The Roseckys accepted Monica's offer. Consideration was provided.

¶60 The unique nature of this contract, however, cannot be understated.[10] Creating a child is not something that one can

_____

[10] The guardian ad litem's brief summarizes why surrogacies are so unique:

> [T]his case exists at the intersection of several distinct and historically different areas of law and stands at the crossroads of ever-evolving artificial reproduction technology.

28

decide to do one day and decide not to do the next. Typical damages cannot make one whole. Nonetheless, this is a contract and we conclude that it is largely enforceable.

¶61 Specifically, we conclude that the interests supporting enforcement of the PA are more compelling than the interests against enforcement. Enforcement of surrogacy agreements promotes stability and permanence in family relationships because it allows the intended parents to plan for the arrival of their child, reinforces the expectations of all parties to the agreement, and reduces contentious litigation that could drag on for the first several years of the child's life.

¶62 We do not hold this opinion alone; the legislature has manifested its intent in the children's code, wherein it concluded that the best interests of the child are always paramount. See Wis. Stat. § 48.01. See also § 767.41(5) (stating that in custody and placement determinations, the court considers "all facts relevant to the best interest of the child"); § 54.15(1) (stating that in selection of a guardian for a proposed ward, the "best interests of the proposed ward shall control"); § 938.01(2)(f) (stating that in the Juvenile Justice Code, the court considers "each juvenile's best interest" in responding to "a juvenile offender's needs for care and

---

The most critical fact that distinguishes this case from others is that [F.T.R.] was created so that the Roseckys could have a child of their own. This crucial fact distinguishes this case from an adoption, third-party placement, paternity or divorce case.

29

treatment").  Furthermore, the legislature has legislated that "instability and impermanence in family relationships are contrary to the welfare of children."  Wis. Stat. § 48.01(1)(a).

¶63 According to the expert testimony in this case, social science research also supports the conclusion that permanency and stability promote child welfare, whereas being exposed to contentious family relationships, an inevitable consequence of litigation, is harmful.  As Dr. Waldron testified: "[O]ut of over 2,000 studies that have been done . . . where there are separate caregivers, . . . in every single one . . . the higher the level of tension and conflict, the more detrimental it is to kids. . . . [T]hat is the number one predictor for child adjustment over time, [] whether or not there's tension and conflict between caregivers."  Dr. Huebner also testified that, according to research, the tension between the Roseckys and Schissels could be harmful to F.T.R.

¶64 We find no public policy statement contrary to the enforcement of the PA in the Wisconsin Statutes or in Wisconsin cases.[11]

---

[11] To support their public policy arguments, the Roseckys, the Schissels, and the guardian ad litem point to cases and statutes from other jurisdictions.  While it is true that many other jurisdictions have examined surrogacy issues, there is no clear majority rule:

> The vast majority of states are silent or near silent on the issues of whether, when, and how surrogacy agreements are enforceable, void, or voidable.  Of those states that do have laws on the books regarding such agreements, the responses range from relying heavily on the Uniform Parentage Act or party intent to outright bans or even criminalization

¶65 The portions of the PA requiring Monica to terminate her parental rights, however, are not enforceable under the language of the existing statutes.  The PA stated that "[t]he parties will cooperate fully in any parentage proceedings to determine [the Roseckys] as [C]hild's legal parents, or in any other similar legal proceedings, including but not limited to termination of parental rights and adoption."  It further stated:

> The parties intend to participate voluntarily in any legal proceedings necessary to have [the Roseckys] determined to be Child's legal parents . . . . It is the intent of the parties that regardless of any circumstances that may arise in the future, both

of surrogacy.  In many of the states that are 'silent' on surrogacy, bills have been shot back-and-forth through the legislature but come to naught.

Hofman, supra, at 454.  See also Mark Hansen, As Surrogacy Becomes More Popular, Legal Problems Proliferate, ABA Journal, Mar. 2011, at 55;  Thomas J. Walsh, Wisconsin's Undeveloped Surrogacy Law, Wisconsin Lawyer, Mar. 2012, at 20.  Case law in this area is similarly scattered.  See, e.g., Raftopol v. Ramey, 12 A.3d 783, 793 (Conn. 2011) (concluding that Connecticut Statute, which governs birth certificates when birth is subject to a surrogacy agreement, "allows an intended parent who is a party to a valid [surrogacy] agreement to become a parent without first adopting the children, without respect to that intended parent's genetic relationship to the children" (emphasis omitted)); Johnson v. Calvert, 851 P.2d 776, 782 (Cal. 1993) (concluding that when the intended mother/egg donor and the gestational carrier had equal claims to maternity under California law, "she who intended to procreate the child——that is, she who intended to bring about the birth of a child that she intended to raise as her own——is the natural mother under California law"); Matter of Baby M., 537 A.2d 1227, 1246-50 (N.J. 1988) (concluding that enforcement of a traditional surrogacy agreement violated various statements of public policy).

31

> [Marcia] and [David] shall be the legal parents of Child. The parties agree to sign all necessary documents and attend any scheduled court hearings either prior to or after Child's birth to achieve these goals.

As the circuit court correctly noted, the portions of the PA requiring a voluntary TPR do not comply with the procedural safeguards set forth in Wis. Stat. § 48.41 because Monica would not consent to the TPR and there is no legal basis for involuntary termination. See Wis. Stat. § 48.415. As a result, the TPR provisions of the PA are unenforceable. That fact, however, does not end the analysis.

¶66 We further conclude that the offending TPR provisions in the PA can be severed from the remainder of the contract without defeating the primary purpose of the agreement. The PA addresses severability:

> In the event any of the provisions of this Agreement are deemed to be invalid or unenforceable, such provisions will be deemed severable from the remainder of this Agreement and will not cause the invalidity or unenforceability of the remainder of this Agreement. Consistent with the provisions of this paragraph, if any provision is deemed invalid due to its scope or breadth, such provision will be deemed valid to the extent of the scope or breadth permitted by law.

Though a severability clause itself is not controlling, it is entitled to great weight in determining whether the remainder of a contract is enforceable. See Town of Clearfield, 150 Wis. 2d at 24. The primary purpose of this agreement is to ensure that the Roseckys will be the parents of F.T.R. and will have custody and placement. The PA contains provisions for custody and placement: "The parties believe strongly that Child's best

32

interests will be served by being in [the Roseckys'] legal custody and physical placement, as it is necessary for Child to regard [the Roseckys] as the sole legal parents and [the Roseckys'] home as the sole parental home." The purpose of the PA can be carried out, after severing the TPR portions, by enforcing the custody and placement provisions of the PA. See Simenstad, 22 Wis. 2d at 662.

¶67 As to the remaining portions of the PA, the current court record does not support any defense to the enforcement of the contract so as to render it unenforceable. There are no facts in the record to indicate, nor does Monica argue, that the contract should be void or voidable due to misrepresentation, mistake, duress, undue influence, or incapacity. See Apfeld et al., supra, ch. 3. Instead, the facts in the record appear to establish that the contract was entered into voluntarily and was well-planned, negotiated, and carefully executed. The circuit court made findings about the PA:

> The contract, on its face, is clear and unambiguous. . . .
>
> The parties are each represented by counsel, and were at the time the agreement was drawn. The agreement itself covers virtually every eventuality which could possibly occur during the pregnancy.
>
> There is no claim here by [Monica] that she did not understand the contract when she signed it. Indeed, to a great extent, it appears it was her idea to act as a surrogate in the first instance.
>
> Had [Monica] gone through with the termination of her parental rights, this Court would have no problem upholding the agreement . . . .

33

Monica offered, not once but twice, to act as a surrogate for the Roseckys. Both the Roseckys and the Schissels had independent counsel, who assisted in drafting and revising the parties' agreement. The parties negotiated the terms of the agreement. When the Roseckys raised concerns about using Monica's egg, for fear that she would not be able to separate herself from the child, Monica reassured the Roseckys that she could separate herself from the child. Monica testified that she understood all of the terms of the contract and that she simply changed her mind as to the terms.

¶68 Instead of arguing that the contract is void due to duress, mistake, or similar reasons, Monica argues that the PA is void as against public policy. The essence of Monica's public policy argument is that a contract cannot cut off a biological parent from his or her child, and any contract that purports to do so violates a myriad of cases and statutes relating to divorce, custody, placement, adoption, and similar areas. A contract will not be enforced if it violates public policy. Watts, 137 Wis. 2d at 521. A court may declare a contract void on public policy grounds only if it determines, after weighing the interests, that the interests in enforcing the contract are clearly outweighed by the interests in upholding the policy that the contract violates. Id.; Restatement (Second) of Contracts § 178 (1981). Public policy may be expressed by a statute, regulation, or judicial opinion. See N. States Power Co. v. Nat'l Gas Co., Inc., 2000 WI App 30,

34

¶8, 232 Wis. 2d 541, 606 N.W.2d 613.  For the reasons stated above, we reject Monica's public policy arguments.

¶69 In summary, though the TPR portions of the PA cannot be enforced under Chapter 48 of the Wisconsin Statutes, the remainder of the PA is an enforceable contract.  No Wisconsin Statute or case contains a specific statement of public policy contrary to the enforcement of this PA.  We conclude that enforcement of surrogacy agreements promotes stability and permanence in family relationships because it allows the intended parents to plan for the arrival of their child, reinforces the expectations of all parties to the agreement, and reduces contentious litigation that could drag on for the first several years of the child's life.  Aside from the termination of parental rights provisions in the PA at issue, the PA is a valid, enforceable contract unless enforcement is contrary to the best interests of F.T.R.  We turn to consider the circuit court action concerning custody and placement.

### 3. Application

¶70 The circuit court awarded primary custody and placement to David and secondary placement to Monica.  It did so, however, without consideration of the PA.  We conclude that the circuit court erroneously exercised its discretion by excluding the PA and rendering its custody and placement decision without consideration of the PA.

¶71 In custody and placement determinations, the circuit court has discretion to make a determination of what is in a child's best interests.  See Wis. Stat. § 767.41(5); Jocius, 218

Wis. 2d at 110-11; <u>Hollister</u>, 173 Wis. 2d at 416.   We will sustain the circuit court's discretionary determination unless it constitutes an erroneous exercise of discretion.   <u>See</u> <u>Lubinsky</u>, 314 Wis. 2d 395, ¶5; <u>Bohms</u>, 144 Wis. 2d at 497.

¶72 Because we conclude that the PA is a valid, enforceable contract, the circuit court's exclusion of the PA and decision to render a custody and placement order without consideration of the PA constituted an erroneous exercise of discretion.[12]   <u>Id.</u>, at 496.   We therefore reverse the circuit court's order and remand for a determination of custody and placement consistent with this opinion.

### V. POTENTIAL LEGISLATIVE ACTION

---

[12] The PA contains several provisions on the custody and placement of the child:

[The Roseckys] will have physical placement of Child immediately upon Child's birth . . . . [The Schissels] waive any and all claims to . . . custody, visitation, and physical placement of Child . . . . The parties believe strongly that Child's best interests will be served by being in [the Roseckys'] legal custody and physical placement, as it is necessary for Child to regard [the Roseckys] as the sole legal parents and [the Roseckys'] home as the sole parental home.

. . . .

. . .It is in Child's best interests that legal custody be with [the Roseckys] immediately upon Child's birth, with no child support to be paid by [the Schissels], that physical placement be with [the Roseckys] upon Child's release from the hospital, and that placement or visitation with [the Schissels] be denied, as the parties agree that Child should view [the Roseckys] as the sole legal parents and [the Roseckys'] home as the sole parental home.

¶73 We respectfully urge the legislature to consider enacting legislation regarding surrogacy.[13]  Surrogacy is currently a reality in our Wisconsin court system.  Legislation could "address surrogacy agreements to ensure that when the surrogacy process is used, the courts and the parties understand the expectations and limitations under Wisconsin law."[14]  Walsh, supra, at 56.

## VI. CONCLUSION

¶74 Aside from the termination of parental rights provisions in the PA at issue, we conclude a PA is a valid, enforceable contract unless enforcement is contrary to the best interests of the child.  While the traditional defenses to the enforcement of a contract could apply, none appear to render the entire PA in this case unenforceable.

¶75 We also conclude that the circuit court erroneously exercised its discretion by excluding the PA and rendering its custody and placement decision without consideration of the PA.

---

[13] Assisted reproductive technology has turned "the science of making babies into a $3 billion-a-year industry."  Hansen, supra, at 54.  Though reliable data is scarce on the number of surrogacies that occur every year, one account estimates that about 22,000 babies have been born using surrogacy in the United States since the mid-1970s.  Id.  Anecdotal evidence from attorneys practicing in this area suggests that the number may be much higher.  Id. (noting a California surrogacy attorney's account that her office handles about 150 surrogacies a year).

[14] See, e.g., Raftopol, 12 A.3d at 801-03 (calling for legislative guidance and listing a myriad of legal issues presented by surrogacy); ABA Model Act (Feb. 2008); Uniform Parentage Act (2002); 750 Ill. Comp. Stat. Ann. § 47/1-47/75 (West 2012) ("Illinois Gestational Surrogacy Act").

We reverse the circuit court's determination that the PA is unenforceable and remand for a hearing on custody and placement, wherein the terms of the PA are enforced unless enforcement is contrary to the best interests of F.T.R.

*By the Court.*—Order reversed and cause remanded for proceedings consistent with this opinion.

¶76 SHIRLEY S. ABRAHAMSON, C.J. *(concurring)* I too would remand the matter to the circuit court. I would, however, instruct the circuit court to follow the legislative directive in Wis. Stat. § 767.41(5)(am) for deciding the legal custody and physical placement dispute in the present case.

¶77 I do not join the majority opinion because I disagree with the majority opinion's authorization of people to contract out of the State's traditional, statutory oversight role in the protection of children.

¶78 Courts should not sacrifice statutes or public policy considerations on the altar of freedom of contract:

> There are, in a civilized society, some things that money cannot buy. In America, we decided long ago that merely because conduct purchased by money was "voluntary" did not mean that it was good or beyond regulation and prohibition.[1]

¶79 I write separately for two reasons:

¶80 First, although I conclude that surrogacy contracts are not per se void as a matter of law in Wisconsin, I caution that the provisions of these contracts demand a court's careful attention. Courts must be alert to the terms of a surrogacy contract no matter how the parties title the contract. In the present case, the parties decided to call the surrogacy contract a "Parentage Agreement."

¶81 A surrogacy contract is no less than a contract that governs bodily intrusions, the use of human bodies for

---

[1] Matter of Baby M., 537 A.2d 1227, 1249 (N.J. 1988) (citing West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937)).

1

altruistic or commercial gain, the creation of a child, and the legal custody and physical placement of a child once it is born.

¶82 Such agreements are not standard run-of-the-mill contracts subject merely to the usual offer, acceptance, and consideration analysis. See majority op., ¶¶57, 59. Standard contract defenses and remedies are a starting point, but may not be sufficient. Surrogacy contracts, in whole or in part, are by their subject matter likely to collide with statutes and raise numerous public policy issues (some addressed directly by statute, others not) and questions of unconscionability. The majority opinion takes a carefree attitude toward public policy considerations, seemingly declaring all surrogacy agreements valid.[2]

---

[2] The majority opinion seems to vacillate in reaching its conclusion. At times it appears to state that the enforcement of the Parentage Agreement in the present case is not contrary to statutes, case law, or public policy. At other times, the majority opinion reads more broadly to state that the public policy of Wisconsin supports surrogacy agreements in general and that no Wisconsin statute or case contains a specific statement of public policy contrary to surrogacy agreements.

Under either interpretation, the majority opinion does not address the numerous public policy issues regarding the validity of this agreement and surrogacy agreements in general, including the following: must the agreement be in writing; should compensated agreements be allowed and what are the limits on compensation; should the availability of surrogacy be limited to married couples or to infertile intended parents; should the age of any party be limited; should a spouse be required either to consent or to be made a party to the contract; must each individual involved be represented by counsel; should the State require that information about each individual's legal rights be provided; what provisions are valid regarding who makes decisions about health care and termination of the pregnancy; how and when may the agreement be terminated; and must any party to the agreement be given the opportunity to change his or her mind before or after the birth of the child?

2

¶83 Public policy considerations regarding a surrogacy contract may differ depending on the nature of the dispute. In the present case the dispute centers on the paternity, the custody, and the physical placement of a child born of alternative reproductive methods with a surrogacy agreement among friends. See ¶¶104-112, infra. Although the biological parents "contractually" agreed in the present case that the child's best interests would be served if the surrogate mother did not have custody and physical placement, the surrogate mother has refused to abide by the terms of the contract. Majority op., ¶¶12, 72 n.12

¶84 Different legal and public policy issues may arise in different disputes and under different contract provisions. Different issues may arise when gestational surrogacy agreements, rather than traditional surrogacy agreements, are implicated. In all surrogacy contracts, public policy issues are in the forefront.[3]

¶85 Second, I write because the present case arose as a petition by David Rosecky for paternity requesting a determination of the legal custody and physical placement of the named child. The majority opinion ignores the posture of the

---

[3] Policy decisions to be made in validating or voiding surrogacy agreements appear in the case law and statutes of other states and nations. See, e.g., Unif. Parentage Act Art. 8, 9B U.L.A. 360 (2000) (gestational agreement); American Bar Association, Model Act Governing Assisted Reproductive Technology (2008), available at http://apps.americanbar.org/family/committees/artmodelact.pdf (last visited June 28, 2013).

case and mischaracterizes the instant case as simply a contract dispute. Majority op., ¶¶28, 48, 55-60, 66-69.

¶86 All three actions brought by David Rosecky, the biological father——for paternity, custody, and physical placement——are, under the plain text of the statutes, categorized as "actions affecting the family," and as such are governed by Chapter 767. See ¶¶104-112, infra. The legislative standard established in Chapter 767 for legal custody and physical placement of a child directs courts to "consider all facts relevant to <u>the best interest of the child</u>." Wis. Stat. § 767.41(5)(am) (emphasis added). Indeed, the legislature has enumerated 16 factors that may be relevant for a court's consideration in determining the best interest of a child, including agreements by a parent.

¶87 The majority opinion ignores the statutes and creates its own standard for deciding the legal custody and physical placement of the child. The guiding principle for legal custody and physical placement when a surrogacy agreement is implicated, according to the majority opinion, will be the custody and placement provisions set forth in the surrogacy contract unless enforcement of the contract is "<u>contrary to the best interests of the child.</u>" Majority op., ¶¶3, 4, 30, 31, 55, 69, 74, 75.

¶88 The majority opinion departs from the legislative mandate. Yet the majority opinion does not explain why a child born of alternative reproductive methods should have different rights and be treated differently under the custody and placement statutes than any other child.

4

I

¶89 The question whether to enforce surrogacy contracts is a matter of first impression for this court, but not for legislatures and courts of other states and nations and not for legal commentators and scholars. In the last three years alone, over 180 law journal articles have been published addressing surrogacy contracts.

¶90 Nonetheless, the majority opinion has no hesitancy in declaring that public policy supports the enforcement of such contracts. Majority op., ¶¶64, 69. Yet the validity of surrogacy contracts, in whole or in part, is at this very time being debated across the globe.

¶91 Other states and nations are, at best, divided over whether to enforce such contracts because of the difficult public policy issues they present. A recent law review article summarized the various approaches to surrogacy contracts from state to state as follows:

> There is no clear majority approach to surrogacy. There is not even a clear plurality approach. Some states permit and enforce a wide range of surrogacy contracts. Some enforce only a limited subset of such contracts. Many states have no law on the subject or refuse to enforce surrogacy contracts. Three states not only refuse to enforce surrogacy contracts, but impose civil or criminal penalties on those arranging and entering into surrogacy contracts.[4]

---

[4] Paul G. Arshagouni, Be Fruitful and Multiply, by Other Means If Necessary: The Time Has Come to Recognize and Enforce Gestational Surrogacy Agreements, 61 DePaul L. Rev. 799, 800 (2012). See generally Raftopol v. Ramey, 12 A.3d 783, 801-804 n.35-46 (Conn. 2011) (collecting statutes and cases). See majority op., ¶64 n.11.

5

¶92 Beyond the fact that there is no clear majority approach to surrogacy among the states that have acted, many states still have said virtually nothing on the topic.[5] Among those that have acted, the legislative approach varies significantly from state to state.[6]

¶93 Several state legislatures ban traditional surrogacy contracts, while others permit traditional surrogacy contracts under certain circumstances. Some states differentiate between traditional and gestational surrogacy contracts. In some states in which no statutes cover surrogacy contracts, courts have held

---

[5] 7 <u>Williston on Contracts</u> § 16.22 Surrogacy Agreements (4th ed. 2012). <u>See also</u> Darra L. Hofman, <u>"Mama's Baby, Daddy's Maybe:" A State-by-State Survey of Surrogacy Laws and Their Disparate Gender Impact</u>, 35 Wm. Mitchell L. Rev. 449 (2009).

[6] <u>See, e.g.</u>, Ala. Code § 26-10A-34(c) (2013); Ariz. Rev. Stat. Ann. § 25-218 (2012); Ark. Code Ann. § 9-10-201(b) (West 2013); D.C. Code § 16-402 (2012); Fla. Stat. Ann. §§ 63.212-.213, § 742.15 (West 2011); Ind. Code Ann. §§ 31-20-1-1 to -3 (West 2013); 750 Ill. Comp. Stat. Ann. §§ 47/1 to /75 (West 2010); Iowa Code Ann. § 710.11 (West 2013); Ky. Rev. Stat. Ann. § 199.590(4) (West 2012); La. Rev. Stat. Ann. § 9:2713 (2012); Mich. Comp. Laws Ann. §§ 722.851-.863 (West 2013); Neb. Rev. Stat. § 25-21,200 (2012); Nev. Rev. Stat. Ann. § 126.045 (West 2011); N.H. Rev. Stat. Ann. §§ 168-B:1 to B:32 (2013); N.Y. Dom. Rel. Law §§ 121-124 (McKinney 2010); N.D. Cent. Code §§ 14-18-05, -08 (2011); Tex. Fam. Code Ann. §§ 160.751-.763 (Vernon 2013); Utah Code Ann. §§ 78B-15-801 to -809 (West 2012); Va. Code Ann. §§ 20-156 to -165 (West 2012); Wash. Rev. Code Ann. §§ 26.26.210-.260 (West 2013).

<u>See also</u> 7 <u>Williston on Contracts</u> § 16.22 n.12 (4th ed. 2012) (Surrogacy Agreements); Anne R. Dana, Note, <u>The State of Surrogacy Laws: Determining Legal Parentage for Gay Fathers</u>, 18 Duke J. Gender L. & Pol'y 353, Appendix 1 (2010-2011). <u>See generally</u> <u>Raftopol</u>, 12 A.3d at 801-804 n.35-46 (collecting statutes and cases).

surrogacy contracts void and unenforceable as contrary to public policy.[7]

¶94 Law review articles have tracked the status of surrogacy contracts around the world.[8] Only a limited number of nations have explicitly addressed surrogacy by statute or through court rulings.[9] Several countries have rejected movements to permit surrogacy within their countries. Some

---

[7] See, e.g., In re Marriage of Moschetta, 30 Cal. Rptr. 2d 893 (Cal. Ct. App. 1994); R.R. v. M.H., 689 N.E.2d 790 (Mass. 1998); Matter of Baby M., 537 A.2d 1227 (N.J. 1988).

[8] See, e.g., Daniel Gruenbaum, Foreign Surrogate Motherhood: Mater Semper Certa Erat, 60 Am. J. Comp. L. 475 (2012); Ailis L. Burpee, Note, Momma Drama: A Study of How Canada's National Regulation of Surrogacy Compares to Australia's Independent State Regulation of Surrogacy, 37 Ga. J. Int'l & Comp. L. 305, 309 (2008-2009); Austin Caster, Note, Don't Split the Baby: How the U.S. Could Avoid Uncertainty and Unnecessary Litigation and Promote Equality by Emulating the British Surrogacy Law Regime, 10 Conn. Pub. Int. L.J. 477 (2010-2011); Sarah Mortazavi, Note, It Takes a Village to Make a Child: Creating Guidelines for International Surrogacy, 100 Geo. L.J. 2249 (2012); Sasha N. Swoveland, Note, Surrogacy and Insurance: The Call for Statutory Reform in Ohio, 26 J.L. & Health 143 (2013).

[9] For example, the United Kingdom, one of the more common surrogacy centers, has a uniform surrogacy law that employs an independent ethics committee to evaluate surrogacy requests on a case-by-case basis and recognizes parents through parental orders. Parental rights are based on the welfare of the child. Human Fertilisation and Embryology Act, 1990, c. 37 (U.K.) (amended 2008), available at http://www.legislation.gov.uk/ ukpga/1990/37/contents/enacted (last visited June 28, 2013). See Mortazavi, supra note 8, at 2270-71.

countries that recognize surrogacy have legalized altruistic surrogacy but not commercial surrogacy.[10]

¶95 These conflicting approaches have transnational implications, one result being that some American states with less restrictive or no laws on the issue have become interstate and international medical surrogacy tourism destinations. It is estimated that over 1,400 babies are born in the United States each year for international parents with the assistance of a surrogate, sometimes American, sometimes foreign.[11]

¶96 Thus, the present case is significant for people in Wisconsin and around the world.

---

[10] In a commercial surrogacy arrangement, the surrogate and often a third party stand to gain financially from the birth of the child. In contrast, an altruistic surrogacy arrangement may involve payment to the surrogate to cover expenses associated with the pregnancy and birth, but neither she nor a third party is paid a fee for the service itself. See Burpee, supra note 8, at 309.

For the Canadian law, see Assisted Human Reproduction Act, S.C. 2004, c. 2 (Can.), available at http://laws-lois.justice.gc.ca/PDF/A-13.4.pdf (last visited June 28, 2013).

[11] Swoveland, supra note 8, at 164.

The United States is second only to India in providing surrogates. India, with no law on the issue, permits both commercial and altruistic surrogacy arrangements and has become a popular medical surrogacy tourism destination for couples seeking lower-cost surrogacy arrangements without being mired in red tape. Mortazavi, supra note 8, at 2271-72; Kathleen Parker, Editorial, Surrogacy Exposed, Wis. State J., May 26, 2013, at E3. See also Emanuella Grinberg, The highs and lows of foreign surrogacy, CNN Living (Mar. 29, 2012) available at http://www.cnn.com/ 2012/03/29/living/sacred-thread-foreign-surrogacy/ (last visited June 28, 2013).

¶97 As I see it, many public policy issues involving the traditional surrogate, the biological father, and the child may be at stake in a legal custody and physical placement dispute in which a surrogacy contract is implicated.[12] Surrogacy contracts by their very nature focus on the interests of the signatories and the signatories' views of what is in the best interest of the child at the time the contract is executed. See majority op., ¶1. A court must view the legal custody and physical placement of a child, irrespective of the means of reproduction, through a wider lens, with emphasis on the best interest of the child, including the legal and constitutional rights of the child, at the time of the court proceedings.

¶98 The public policy implications of a traditional surrogacy contract when the legal custody and physical placement of an existing child are at issue, as in the present case, include:

- Public policy against baby-buying;[13]

---

[12] For example, a dispute may arise when the surrogate or the intended parents seek an abortion. See Elizabeth Cohen, Surrogate Offered $10,000 to Abort Baby, CNN Health (Mar. 6, 2013), available at http://www.cnn.com/2013/03/04/health/surrogacy-kelley-legal-battle/index.html (last visited June 28, 2013) (Medical tests showed an abnormality of the fetus. The agreement entered into in the State of Connecticut authorized the intended parents to determine whether an abortion would be performed; the surrogate refused an abortion and moved to a state that appeared to have laws more favorable to the surrogate's position.).

[13] In the first surrogacy case in the country, the New Jersey Court declared:

We have found that our present laws do not permit the surrogacy contract used in this case. Nowhere, however, do we find any legal prohibition against

9

- Public policy against the exploitation of women;[14]

- Statutes and case law relating to adoption, including terms of consent,[15] termination of parental rights,[16] and the payment of funds;[17] and

surrogacy when the surrogate mother volunteers, without any payment, to act as a surrogate and is given the right to change her mind and to assert her parental rights. Moreover, the Legislature remains free to deal with this most sensitive issue as it sees fit, subject only to constitutional constraints.

Baby M., 537 A.2d at 1264.

Wisconsin statutes regulate payments regarding children. See, e.g., Wis. Stat. § 48.913 (allowing certain payments by proposed adoptive parents to birth parent); Wis. Stat. § 948.24 (criminalizing payments for child placement and services not explicitly authorized by statute). See majority op., ¶¶45, 53.

[14] The Michigan court of appeals explained the compelling state interests in prohibiting surrogacy contracts as follows: (1) preventing children from becoming mere commodities; (2) protecting the best interests of the child, because surrogacy arrangements focus solely on the parents' interests and desires; and (3) preventing the exploitation of women. Doe v. Attorney Gen., 487 N.W.2d 484 (Mich. Ct. App. 1992).

For a discussion of the advertising directed at prospective surrogates, the fees paid to them, the third parties who benefit from arranging surrogacy contracts, and the potential for exploiting poor women, see Kathleen Parker, Editorial, Surrogacy Exposed, Wis. State J., May 26, 2013, at E3 ("[W]e haven't scraped the surface of the metaphysical, spiritual, emotional, [and] psychological issues" that accompany the surrogacy business.).

A simple Google search of "Wisconsin Surrogacy" turns up advertisements offering up to $50,000 for women to serve as surrogates.

10

- Statutes and case law governing legal custody and physical placement focusing on the best interests of the child.[18]

---

[15] Wisconsin has stringent requirements for voluntary consent to terminate parental rights that require a parent to appear in court or provide written consent in the presence of a judge, embassy, or consulate official. See Wis. Stat. § 48.41. In adoption situations, a mother can withdraw her consent even after agreeing to give her child up for adoption. Matter of Adoption of R.P.R., 98 Wis. 2d 613, 619, 297 N.W.2d 833 (1980).

[16] Indeed the majority opinion strikes down a provision of the Parentage Agreement regarding the termination of parental rights on the ground that the Agreement violates Wisconsin statutes. Majority op., ¶65.

Other states have also declared surrogacy contracts or parts thereof invalid because they conflict with legislation governing adoption and the termination of parental rights, the public policy embodied in the statutes, and case law. See Baby M., 537 A.2d at 1242-44.

The California court of appeals refused to give effect to the terms of a traditional surrogacy agreement, holding that "enforcement of a traditional surrogacy contract by itself is incompatible with the parentage and adoption statutes already on the books." Moschetta, 30 Cal. Rptr. 2d at 894-95.

Compare these decisions refusing to enforce traditional surrogacy contracts with court decisions approving gestational surrogacy arrangements. See, e.g., Johnson v. Calvert, 851 P.2d 776 (Cal. 1993); Raftopol v. Ramey, 12 A.3d 783 (Conn. 2011); J.F. v. D.B., 879 N.E.2d 740 (Ohio 2007).

[17] In New York, a surrogacy agreement was declared void and unenforceable because it violated the statutory prohibition against acceptance of compensation in exchange for the surrender of a child for adoption. Matter of Adoption of Paul, 550 N.Y.S.2d 815 (1990). New York has since banned surrogacy contracts by statute. N.Y. Dom. Rel. Law §§ 122-123 (McKinney 2010).

[18] Doe v. Attorney Gen., 487 N.W.2d 484 (Mich. Ct. App. 1992).

¶99 In my opinion, when faced with a dispute relating to legal custody and physical placement of a child, a circuit court must carefully scrutinize the surrogacy contract to ensure that the contract does not contravene public policy. I do not join the majority's overly broad holding that "a [Parentage Agreement] is a valid, enforceable contract unless enforcement is contrary to the best interests of the child." Majority op., ¶3 (emphasis added).

## II

¶100 I turn now to the second issue, namely what rule of law the circuit court should apply to decide the legal custody and physical placement of the child in the present case.

¶101 The majority opinion creates its own law, instructing circuit courts to enforce the Parentage Agreement unless enforcement is contrary to the best interests of the child. Majority op., ¶¶3, 4, 30, 31, 55, 69, 74, 75.[19]

¶102 In contrast with the majority opinion, I would instruct the circuit court to adhere to the legislature's directions in Wis. Stat. § 767.41(5)(am). This statute

---

The Supreme Judicial Court of Massachusetts held that no private surrogacy agreement concerning the custody of a child can be conclusive, because a judge must decide what is in best interest of child. R.R. v. M.H., 689 N.E.2d 790 (Mass. 1998).

[19] The phrase "contrary to the best interest of the child" is not entirely new to Wisconsin statutes. None of the statutes using the phrase applies to the present case. The legislature seems to have given guidance to the courts in these statutes regarding what is contrary to the best interests of the child. See, e.g., Wis. Stat. §§ 48.365(2g)(b)3., 48.977(2)(f), 767.41(2)d)1., 767.80(2), 938.18(6) ("contrary to the best interests of the juvenile").

12

explicitly governs a circuit court's determination of legal custody and physical placement of a child.

¶103 The majority opinion deviates from the statute by boldly but erroneously asserting that this action is not an "action affecting the family." Majority op., ¶43.

¶104 On the contrary, the present case is, without question, "an action affecting the family" and is governed by Chapter 767 of the statutes.

¶105 The statute, Wis. Stat. § 767.001, defines "action affecting the family" to mean an action to determine paternity, a custody action, and an action concerning physical placement, in addition to other actions.[20] David Rosecky, the biological father (and not the husband of the biological mother) brought the instant case as a paternity action. A paternity action

---

[20] Wisconsin Stat. § 767.001, "Definitions," provides in relevant part:

In this chapter:

(1) "Action affecting the family" means any of the following actions:

. . . .

(e) Custody.

. . . .

(k) Concerning periods of physical placement or visitation rights to children, including an action to prohibit a move with or the removal of a child under s. 767.481(3)(c).

. . . .

(L) To determine paternity.

protects a biological father's rights associated with the parentage of a child.

¶106 David Rosecky had to have a court determination of paternity. The Wisconsin statutes create a presumption that the husband of the birth mother (not David Rosecky) is the biological father of the child.

¶107 According to the statutes, a husband is presumed to be the father of a child when the child is born during wedlock.[21]

---

[21] Wisconsin Stat. § 891.41 provides as follows:

891.41. Presumption of paternity based on marriage of the parties.

(1) A man is presumed to be the natural father of a child if any of the following applies:

(a) He and the child's natural mother are or have been married to each other and the child is conceived or born after marriage and before the granting of a decree of legal separation, annulment or divorce between the parties.

(b) He and the child's natural mother were married to each other after the child was born but he and the child's natural mother had a relationship with one another during the period of time within which the child was conceived and no other man has been adjudicated to be the father or presumed to be the father of the child under par. (a).

(2) In a legal action or proceeding, a presumption under sub. (1) is rebutted by results of a genetic test, as defined in s. 767.001 (1m), that show that a man other than the man presumed to be the father under sub. (1) is not excluded as the father of the child and that the statistical probability of the man's parentage is 99.0% or higher, even if the man presumed to be the father under sub. (1) is unavailable to submit to genetic tests, as defined in s. 767.001 (1m).

14

Furthermore, another statute provides that when a woman is artificially inseminated with semen donated by a man who is not her husband, the husband is deemed the natural father of the child (and the donor has no rights regarding the child).[22] Several cases implicating these statutes have come to Wisconsin

---

[22] Wisconsin Stat. § 891.40 provides as follows:

891.40. Artificial insemination

(1) If, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband of the mother at the time of the conception of the child shall be the natural father of a child conceived. The husband's consent must be in writing and signed by him and his wife. The physician shall certify their signatures and the date of the insemination, and shall file the husband's consent with the department of health services, where it shall be kept confidential and in a sealed file except as provided in s. 46.03(7)(bm). However, the physician's failure to file the consent form does not affect the legal status of father and child. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician or elsewhere, may be inspected only upon an order of the court for good cause shown.

(2) The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is not the natural father of a child conceived, bears no liability for the support of the child and has no parental rights with regard to the child.

appellate courts to determine the paternity of a child born during a marriage.[23]

¶108 David Rosecky's paternity petition asked the circuit court to determine that David Rosecky is the father of the child for all legal purposes, to direct the section of Vital Statistics for the State of Wisconsin to identify David Rosecky as the birth father of the child,[24] and to determine that David Rosecky shall have legal custody and physical placement of the child.

¶109 After the paternity action was filed, and as part of the paternity action, the parties stipulated that David Rosecky is the father of the child and that the surrogate mother's husband shall be excluded as the father of the child.

¶110 In a paternity action, a circuit court may decide legal custody and physical placement of the named child. Wisconsin Stat. § 767.41(1)(b) provides that in rendering a judgment of paternity, "the court shall make provisions as it deems just and reasonable concerning the legal custody and physical placement of any minor child of the parties . . . " (emphasis added). Wisconsin Stat. § 767.41(1) provides, inter

---

[23] See, e.g., Randy A.J. v. Norma I.J., 2004 WI 41, 270 Wis. 2d 384, 677 N.W.2d 630 (husband filed for divorce seeking custody of child; wife counterclaimed challenging husband's paternity); In re Paternity of T.R.B., 160 Wis. 2d 840, 467 N.W.2d 553 (Ct. App. 1991) (single man filed paternity claim to child born to another man's wife); Strawser v. Strawser, 126 Wis. 2d 485, 377 N.W.2d 196 (Ct. App. 1985) (on divorce, husband challenged paternity of children born during marriage).

[24] Birth certificates may be changed by the state registrar of vital statistics. See Wis. Stat. §§ 69.01(24), 69.15(1).

_alia_, that "the question of a child's custody may be determined as an incident of any action affecting the family . . . ."

¶111 Accordingly, Chapter 767, which governs "actions affecting the family," governs the present case for at least three distinct reasons; the present case involves three actions affecting the family: custody, physical placement, and paternity. Majority op., ¶13-14. The Parentage Agreement itself supports the conclusion that the present case involves an action affecting the family, as the Agreement specifically includes "the parties' agreements as to parentage, legal custody, and physical placement." Majority op., ¶10.

¶112 Under Chapter 767, the legislature has directed that "in determining legal custody and periods of physical placement, the court shall consider all facts relevant to the best interest of the child (emphasis added)." Wis. Stat. § 767.41(5)(am). "Child" is statutorily defined to mean an individual who has not attained 18 years of age.[25] The individual whose paternity, custody, and placement are the subject of the present case has not attained 18 years of age. The statutes governing paternity, legal custody, and placement govern all children; they do not differentiate among children on the basis of the reproductive methods used. The majority opinion should not do so either.

¶113 Wisconsin Stat. § 767.41(5)(am) has enumerated 16 facts relevant in determining the best interest of the child. For purposes of analysis, these factors "can be grouped into four broad categories . . .: (1) factors that analyze the wishes

---

[25] Wis. Stat. §§ 822.02(2); 767.01(2m).

17

of the parents and the child; (2) factors that analyze the stability and consistency of the parents' relationship with the child; (3) factors that focus on the physical and mental health of the parties and the children; and (4) factors that look at the behaviors of each party."[26]

¶114 Section 767.41(5)(am) provides as follows:

**Wis. Stat. § 767.41(5) Factors in custody and physical placement determinations.** (am) . . . in determining legal custody and periods of physical placement, the court shall consider all facts relevant to the best interest of the child. The court may not prefer one parent or potential custodian over the other on the basis of the sex or race of the parent or potential custodian. . . . [T]he court shall consider the following factors in making its determination:

1. The wishes of the child's parent or parents, as shown by any stipulation between the parties, any proposed parenting plan or any legal custody or physical placement proposal submitted to the court at trial.

2. The wishes of the child, which may be communicated by the child or through the child's guardian ad litem or other appropriate professional.

3. The interaction and interrelationship of the child with his or her parent or parents, siblings, and any other person who may significantly affect the child's best interest.

4. The amount and quality of time that each parent has spent with the child in the past, any necessary changes to the parents' custodial roles and any reasonable life-style changes that a parent proposes to make to be able to spend time with the child in the future.

---

[26] Thomas J. Walsh, In the Interest of A Child: A Comparative Look at the Treatment of Children Under Wisconsin and Minnesota Custody Statutes, 85 Marq. L. Rev. 929, 944 (2001-2002) (emphasis added).

5. The child's adjustment to the home, school, religion and community.

6. The age of the child and the child's developmental and educational needs at different ages.

7. Whether the mental or physical health of a party, minor child, or other person living in a proposed custodial household negatively affects the child's intellectual, physical, or emotional well-being.

8. The need for regularly occurring and meaningful periods of physical placement to provide predictability and stability for the child.

9. The availability of public or private child care services.

10. The cooperation and communication between the parties and whether either party unreasonably refuses to cooperate or communicate with the other party.

11. Whether each party can support the other party's relationship with the child, including encouraging and facilitating frequent and continuing contact with the child, or whether one party is likely to unreasonably interfere with the child's continuing relationship with the other party.

12. Whether there is evidence that a party engaged in abuse, as defined in s. 813.122(1)(a), of the child, as defined in s. 48.02(2).

12m. Whether any of the following has a criminal record and whether there is evidence that any of the following has engaged in abuse, as defined in s. 813.122(1)(a), of the child or any other child or neglected the child or any other child:

a. A person with whom a parent of the child has a dating relationship, as defined in s. 813.12(1)(ag).

b. A person who resides, has resided, or will reside regularly or intermittently in a proposed custodial household.

13. Whether there is evidence of interspousal battery as described under s. 940.19 or 940.20(1m) or domestic abuse as defined in s. 813.12(1)(am).

14. Whether either party has or had a significant problem with alcohol or drug abuse.

15. The reports of appropriate professionals if admitted into evidence.

16. Such other factors as the court may in each individual case determine to be relevant.

(Emphasis added.)

¶115 No one factor enumerated in Wis. Stat. § 767.41(5) is necessarily determinative of custody, and the same combination of factors does not necessarily call for an identical answer in two different cases.[27]

¶116 Significant for the present case is that the legislature has explicitly instructed a circuit court how to address agreements between parents and any legal or custody proposal submitted to the court. The legislature envisaged agreements and proposals, and the legislature has directed courts to consider "the wishes of the child's parent or parents, as shown by any stipulation between the parties, any proposed parenting plan or any legal custody or physical placement proposal submitted to the court at trial." Wis. Stat. § 767.41(5)(am)1. The legislature did not direct the courts to rubber stamp the proposal or order specific performance of an agreement relating to custody and physical placement, as David Rosecky requests. Majority op., ¶13.

¶117 I agree with the majority opinion that the circuit court in the present case erroneously exercised its discretion

---

[27] King v. King (King II), 29 Wis. 2d 586, 590-91, 139 N.W.2d 635 (1966).

20

by refusing to consider the Parentage Agreement.  I think such consideration is required by Wis. Stat. § 767.41(5).

¶118 The majority opinion, however, does not require a circuit court to consider the other relevant enumerated factors in § 767.41(5) to determine the best interest of the child. Instead the majority opinion states a new rule: A circuit court is bound by a surrogacy contract "unless enforcement is contrary to the best interests of the child."  Majority op., ¶¶3, 4, 30, 31, 55, 69, 74, 75.

¶119 The majority opinion errs as a matter of law by not adhering to the statutory standard set forth in Wis. Stat. § 767.41(5).  The majority opinion errs as a matter of law by placing the surrogacy contract above, and to the exclusion of, all other factors the legislature has enumerated in Wis. Stat. § 767.41(5)(am) and above the best interest of the child.

¶120 The best interest of the child is an organizing principle of Wisconsin family law.  See majority op., ¶62. According to our case law, "The legislature has clearly and repeatedly expressed the policy that courts are to act in the best interest of children."[28]  "The polestar [in a custody dispute] is the best interests of the children."[29]

¶121 The legislature has made clear that "[t]he child's best interests transcend an agreement or stipulation of the

---

[28] Holtzman v. Knott, 193 Wis. 2d 649, 682, 533 N.W.2d 419 (1995).

[29] Johnson v. Johnson, 78 Wis. 2d 137, 148, 254 N.W.2d 198 (1977).

parties."[30] This court has long recognized that "the controlling question [in custody disputes] is not what the parties agreed to but what is in the best interest of the child."[31] Our court has further explained the statutory relationship of an agreement of parties and the child's best interest as follows:

> While parents may stipulate as to custody, the agreement should not be approved by the court unless it insures and promotes the best interest of the children. . . . A contract between parents [in a custody dispute] should be given serious consideration by the court as it normally expresses what may be best for the child, nevertheless it does not bind the court or preclude a modification of a decree based thereon.[32]

¶122 Although the majority opinion mentions Wis. Stat. § 767.41(5) and the best interest of the child standard in passing, see majority op, ¶62, it does not rely on § 767.41(5) or the best interest of the child standard. Rather, it decides, for purposes of all surrogacy contracts, for all children, for all persons, and for all circumstances, that "the interests supporting enforcement of the [Parentage Agreement] are more compelling than the interests against enforcement." Majority op., ¶61. The majority opinion adopts its own formulation of a rule for determining custody and placement that directs circuit courts to follow the contract unless "contrary to the best

---

[30] Frisch v. Henrichs, 2007 WI 102, ¶72, 304 Wis. 2d 1, 736 N.W.2d 85 (quoting Ondrasek v. Tenneson, 158 Wis. 2d 690, 695, 462 N.W.2d 915 (Ct. App. 1990)).

[31] King v. King (King I), 25 Wis. 2d 550, 555, 131 N.W.2d 357 (1964).

[32] King I, 25 Wis. 2d at 555 (citing William T. Nelson, Divorce and Annulment § 15.21 at 268 (2d ed. rev. 1961); Miner v. Miner, 10 Wis. 2d 438, 103. N.W.2d 4 (1960)).

22

interests of the child," without explanation, discussion, or direction to the courts on how the rule should be applied. Majority op., ¶¶3, 75. See also ¶¶4, 30, 31, 55, 69, 74.[33]

¶123 So why doesn't the majority opinion adhere to Wis. Stat. § 767.41(5) in the present case? This is a mandatory (shall) statute that is directly on point.

¶124 The majority opinion explains that "surrogacy is not one of those enumerated" actions affecting the family, majority op., ¶43; surrogacy agreements are not explicitly addressed in Chapter 767 or in Wis. Stat. § 767.41(5); a surrogacy agreement does not present a typical custody case; "the law does not specifically address the legal issues presented in this surrogacy dispute," majority op., ¶55; and that some of the statutory factors enumerated in § 767.41(5) are difficult to apply. Majority op., ¶¶43, 44, 45, 55.[34]

¶125 This reasoning in the majority opinion justifying its disregarding Wis. Stat. § 767.41(5) is confusing, contradictory, and unpersuasive.

---

[33] The guardian ad litem argued that the surrogacy contract should be presumptively enforceable as long as it is in the best interest of the child. See majority op., ¶52.

[34] Presumably, the 16 factors enumerated in Wis. Stat. § 767.41(5)(am) will have different levels of importance in each custody and physical placement case. Is the majority instructing us to ignore all of them because some or even many are "difficult to apply to the facts" of the specific case? See majority op., ¶43. Still, in ¶71, the majority points out that circuit courts have discretion to follow § 767.41(5) to determine what is in the child's best interests. How can ¶43 and ¶71 be reconciled?

¶126 The present case is a paternity, child custody, and physical placement action; thus, it is "an action affecting the family" expressly governed by Chapter 767, including Wis. Stat. § 767.41(5). The legislature has explicitly and in plain language directed courts how to address these actions, including parties' agreements about custody and placement.

¶127 Simply because the words "surrogacy contract" or "Parentage Agreement" do not appear in Chapter 767 or Wis. Stat. § 767.41 (5)(am) does not mean, as the majority opinion reasons, that the statute does not apply to legal custody and physical placement disputes that implicate a surrogacy contract. Majority op., ¶43. The legislature is aware of alternative methods of reproduction and surrogacy, see majority op., ¶¶41, 42, and has not excluded surrogacy agreements from the application of Chapter 767 or § 767.41(5). Rather, the legislature explicitly anticipated that courts should consider parental agreements, without restricting such agreements to the reproductive method used or the title of the agreement.

¶128 If a surrogacy contract should be treated differently than any other type of agreement, the legislature has not instructed the courts to take this distinction into account in exercising discretion under Wis. Stat. § 767.41(5).

¶129 Absent specific statutory instructions that provide a different procedure for adjudicating legal custody and physical placement disputes when an alternative reproductive method and a surrogacy contract are implicated, the circuit courts of this state are, in my opinion, bound to follow the legislative

24

directions for adjudicating legal custody and physical placement for all children set forth in Wis. Stat. § 767.41.

¶130 The plain text of the current statutes applies to the present case. Any change in the law and the procedure regarding actions involving paternity, legal custody, and physical placement of a child when an alternative reproductive method and a surrogacy contract are implicated should not be undertaken by this court. Any change is a task best left to the legislature.

¶131 For the reasons set forth, I write separately.

¶132 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.