### DOE v ATTORNEY GENERAL

Docket No. 113775. Submitted March 20, 1990, at Detroit. Decided
June 1, 1992, at 9:10 A.M.

Jane and John Doe, and two other infertile couples, and Paula
Poe, and another prospective surrogate mother, brought an
action in the Wayne Circuit Court against the Attorney Gen-
eral, seeking an interpretation of the Surrogate Parenting Act
and arguing that if the act were read to prohibit surrogacy
contracts other than only those that made payment conditional
on the surrogate mother's relinquishment of her parental
rights, the act would violate certain constitutional rights. The
trial court, John H. Gillis, Jr., J., held that the statute prohib-
ited surrogacy contracts that provided that the surrogate
mother would receive compensation and agree to relinquish
voluntarily her parental rights, but did not prohibit surrogacy
contracts that provided that no compensation other than medi-
cal expenses would be paid to the surrogate mother. The court
further held that there was no actual case of controversy
because the parties were in agreement concerning the constitu-
tionality of the act, and granted summary disposition for the
defendant on that basis. The plaintiffs appealed.

The Court of Appeals *held:*

1. An actual controversy existed concerning the proper inter-
pretation of the act. The trial court had jurisdiction to hear the
case and erred in granting summary disposition on the basis
that there existed no actual case or controversy.

2. The state has an interest in the protection of surrogate
mothers and their children sufficient to warrant government
intrusion into the reproductive rights of the surrogate mothers
by the regulation of surrogacy contracts.

3. The Surrogate Parenting Act is not void for vagueness. It
clearly renders void and unenforceable surrogate parentage
contracts and makes unlawful any such contract entered into
for compensation. Surrogate parentage contracts, before the

REFERENCES

Am Jur 2d, Constitutional Law § 442; Parent and Child § 3.
Validity and construction of surrogate parenting agreement. 77
ALR4th 70.

1990 amendment of the act, had two elements: an agreement by a female to conceive a child by natural or artificial insemination or to provide surrogate gestation, and an agreement by the surrogate mother to relinquish voluntarily her parental rights. Accordingly, before the amendment of the act, an agreement to provide conception or surrogate gestation services for compensation were not void if there was no agreement requiring relinquishment by the surrogate mother of her parental rights.

4. The Court of Appeals expressed no opinion concerning the effect of the amendment of 1990 PA 190 that created a presumption of relinquishment of parental rights in any agreement in which a female agreed to conceive a child by a man other than her husband or to provide surrogate gestation.

Affirmed in part and reversed in part.

MURPHY, J., concurring, agreed that before the 1990 amendment of the act, surrogacy agreements for compensation that contained no agreement by the surrogate mother to relinquish her parental rights did not meet the definition of a surrogate parentage contract, but stated concern that some may believe that the act as amended does not prohibit surrogacy agreements for compensation unless the birth mother agrees to relinquish her parental rights.

1. CONSTITUTIONAL LAW — RIGHT TO BEAR CHILDREN — SURROGATE PARENTING — COMPELLING STATE INTEREST.

Individual decisions in matters concerning childbearing are constitutionally protected from unjustified intrusion by the state in the absence of a countervailing compelling state interest; there is a compelling state interest in the protection both of surrogate mothers and their children to justify state regulation of surrogate parenting.

2. PARENT AND CHILD — SURROGATE PARENTING — SURROGATE PARENTAGE CONTRACTS.

The Surrogate Parenting Act, before its 1990 amendment, did not make void and unenforceable or unlawful an agreement for conception or surrogate gestation services for compensation if the surrogate mother did not agree also to relinquish her parental rights (MCL 722.851 et seq.; MSA 25.248[151] et seq.; 1990 PA 190).

American Civil Liberties Union Fund of Michigan (by *Robert A. Sedler, Elizabeth L. Gleicher,* and *Paul J. Denenfeld*), for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *A. Michael Leffler* and *Vincent J. Leone,* Assistant Attorneys General, for the defendant.

Before: Holbrook, Jr., P.J., and Murphy and Jansen, JJ.

Holbrook, Jr., P.J. In this action for a declaratory interpretation of the Surrogate Parenting Act, MCL 722.851 *et seq.;* MSA 25.248(151) *et seq.,* plaintiffs appeal as of right from an order of the Wayne Circuit Court granting defendant's motion for summary disposition for failure to state a claim. We affirm in part and reverse in part.

Plaintiffs are infertile couples and prospective surrogate mothers. In their suit, filed on August 4, 1988, plaintiffs assert that if the Surrogate Parenting Act were interpreted as being an outright ban on surrogacy contracts for pay, the statute would deny them their constitutionally protected privacy rights and would offend the Due Process and Equal Protection Clauses of the state and federal constitutions. Plaintiffs maintain that, to avoid unconstitutionality, the statute must be read as permitting such contracts as long as payment to the birth mother is not contingent upon the relinquishment of her parental rights.

In response to plaintiffs' motion for a preliminary injunction, defendant moved for summary disposition for failure to state a claim. At the hearing on the motions, counsel for plaintiffs stated on the record that if the court were to interpret the statute in accordance with defendant's interpretation, plaintiffs would be satisfied with regard to the constitutionality of the statute. Upon that representation, the trial court found the statute to be constitutional and stated that it

would issue a declaratory judgment within sixty days.

On October 4, 1988, defendant moved for reconsideration of the court's oral ruling that a declaratory opinion was to follow, arguing that in light of the agreement of plaintiffs and defendant with regard to the controlling issue, there was no longer a case or controversy and the court had no jurisdiction. Plaintiffs' response, in essence, was that it had become clear that the alleged agreement was a misunderstanding and the controversy remained. In an opinion and order issued on November 9, 1988, the court held that the statute prohibited surrogacy contracts where the surrogate mother receives compensation and agrees to voluntarily relinquish her parental rights. The court held that it was still permissible to enter into a surrogacy contract where no compensation, other than medical expenses, is paid to the mother. The court then went on to rule that because the parties were in agreement concerning the constitutionality of the statute, there was no actual controversy.

Plaintiffs' subsequent motion for reconsideration was denied, and this appeal followed.

I

Plaintiffs' first argument is a jurisdictional one. They argue that the trial court erred in granting summary disposition on the ground that there was no longer an actual controversy. We agree.

A review of the record clearly indicates the existence of a case or controversy. The confusion concerning whether a controversy did exist stems from plaintiffs' misunderstanding of defendant's position.

Plaintiffs alleged that in surrogacy arrange-

ments it is common practice that, once an agreement between the parties has been reached, the infertile couple places the birth mother's compensation in escrow, payable upon the birth of the child, and the infertile couple usually adopts the child within three to four months after birth. The entire agreement is memorialized in a "memorandum of mutual understanding," which is generally viewed by the courts as an instrument not legally binding.

On the basis of a mistaken belief that an agreement had been reached to allow interpretation of the statute in a manner that would permit that type of arrangement, plaintiffs' counsel made his statement concerning the constitutionality of the statute at the hearing. Plaintiffs became aware of the misunderstanding during the period between the hearing and the issuance of the written opinion and order. Plaintiffs then informed the trial court of this misunderstanding in their response to defendant's motion for reconsideration. The court acknowledged plaintiffs' response in its opinion of November 9.

Upon this record we conclude that there was a "case or controversy" existing within the meaning of MCR 2.605(A) when the trial court issued its opinion and that, therefore, the court's finding that it lacked jurisdiction was erroneous.

II

Having resolved the jurisdictional question in the affirmative, we now address the merits of the case. Plaintiffs' contend that the statute violates the due process guarantee of freedom from government interference in matters of marriage, family, procreation, and intimate association. They maintain that the state has no compelling interest in intervening in this conduct. We disagree.

We agree with plaintiffs that the Due Process Clauses of the state and federal constitutions, together with the penumbral rights emanating from the specific guarantees of the Bill of Rights, protect "individual decisions in matters of child-bearing from unjustified intrusion by the State." *Carey v Population Services Int'l,* 431 US 678, 687; 97 S Ct 2010; 52 L Ed 2d 675 (1977). Government however, can justify the abridgment of a fundamental right by demonstrating that a countervailing compelling state interest is thereby promoted and that the means are closely tailored to the end sought to be achieved. *Eisenstadt v Baird,* 405 US 438, 463-464; 92 S Ct 1029; 31 L Ed 2d 349 (1972) (White, J., concurring).

The question before us, then, is, Did the Legislature have a compelling government interest sufficient to justify intrusion into plaintiffs' right to procreate in the surrogacy context? We answer that question in the affirmative.

A

The first interest is that of preventing children from becoming mere commodities.

As overwhelmingly repugnant as the thought may be, unbridled surrogacy for profit could encourage the treatment of babies as commodities. Whatever sense of idealism that may motivate a fertile woman into hosting a pregnancy for an infertile couple is rent asunder by the introduction of the profit motive. It could be only a matter of time before desirable, healthy babies would come to be "viewed quantitatively, as merchandise that can be acquired, at market or discount rates." O'Brien, *Commercial Conceptions: A Breeding Ground for Surrogacy,* 65 NC L R 127, 144 (1986). As the New Jersey Supreme Court commented in

*In re Baby M,* 109 NJ 396, 440; 537 A2d 1227 (1988): "In a civilized society, there are some things that money should not be able to buy." In our opinion, babies ought to be one of those things.

**B**

The best interest of the child is also an interest that is sufficiently compelling to justify government intrusion.

Surrogacy arrangements focus exclusively on the parents' desires and interests, and, accordingly, the parties are apt to be insensitive to what would be in the children's best interests. That position is in direct opposition to the child custody law in this state, the guiding principle of which is the best interests of the child. See MCL 722.23; MSA 25.312(3); *Duperon v Duperon,* 175 Mich App 77; 437 NW2d 318 (1989); and *Zuziak v Zuziak,* 169 Mich App 741; 426 NW2d 761 (1988).

As the New Jersey Supreme Court in *Baby M, supra,* p 441 commented: "The long-term effects of surrogacy contracts are unknown, but feared." It is almost impossible to imagine the emotional anguish that could result to children who learn that they, in effect, were bought and paid for and that their mothers gave birth as a means of obtaining money.

The long-term effects are by no means limited to the emotional trauma that might result from knowing of the purchase and sale aspect of one's birth. The custody battles that in all likelihood will occur where one of the parties to a surrogacy contract has a change of heart, no doubt, will inflict grievous wounds upon the child regardless of who prevails.

C

A third compelling state interest is that of preventing the exploitation of women.

Surrogacy-for-profit arrangements have the potential for demeaning women by reducing them to the status of "breeding machines." The plaintiffs before us validate this fear with their argument that the compensation given surrogate mothers is to be looked upon as compensation for their "gestation services" only.

Surrogacy contracts, no matter how they are cast, contemplate, indeed logically dictate, that there be no connection between the birth mother and the baby after the delivery. Were surrogacy contracts to be validated, every surrogate mother would soon be cast in the role of an "unfeeling, emotionless machine whose purpose is to create a life and then disappear." Recht, *"M" is for Money: Baby M and the Surrogate Motherhood Controversy,* 37 Am U L R 1013, 1022 (1988).

The potential for such exploitation is much broader than being just gender-based, it is economic-based as well. Women in the lower economic strata could well become "breeding machines" for infertile couples of the upper economic brackets. Accordingly, it is the surrogate who bears the brunt of the contractual obligations, for it is her health that is at risk and her conduct that is restricted. The contracting couple, on the other hand, need to supply only the sperm and the compensation. While the surrogate endures the nine-month gestation period and all the attendant physical burdens and risks, the contracting couple are free to go about their lives, anticipating the delivery of their baby.

This is not to say that all surrogate mothers will feel exploited; we can conceive of instances where

the surrogate may derive a great deal of satisfaction from being able to assist an infertile couple in having a child. The fact remains, however, that there is a danger of women being exploited by these surrogacy-for-profit arrangements, and the protection of women from that danger warrant government intrusion.

III

Having thus concluded that there are compelling interests sufficient to warrant governmental intrusion into the otherwise protected area of privacy in the matter of procreation, we next address plaintiffs' argument that the statute is so vague and indefinite in meaning that it is incapable of giving fair warning of what conduct is prohibited by the statute.

A statute may be challenged for vagueness on three grounds: (1) it does not provide fair notice of the conduct proscribed; (2) it confers on the trier of fact unstructured and unlimited discretion to determine whether an offense has been committed; and (3) its coverage is overly broad and impinges on First Amendment freedoms. *Kolender v Lawson,* 461 US 352; 103 S Ct 1855; 75 L Ed 2d 903 (1983); *Woll v Attorney General,* 409 Mich 500; 297 NW2d 578 (1980); *People v Howell,* 396 Mich 16; 238 NW2d 148 (1976).

In testing a statute for vagueness, a court should give the words of the statute their ordinary meaning. *In re Forfeiture of 719 North Main,* 175 Mich App 107, 111; 437 NW2d 332 (1989); *People v Jackson,* 140 Mich App 283, 287; 364 NW2d 310 (1985).

Plaintiffs' argument focuses on the use of the conjunctive "and" in the definition of "surrogate parentage contract" found MCL 722.853(i); MSA

25.248(153)(i). Plaintiffs maintain that the phrase "and to voluntarily relinquish her parental rights to the child" means that only those arrangements that link conception and surrogate gestation services to the relinquishment of parental rights are prohibited. The plaintiffs assign error to the trial court's interpretation that the act prohibits all arrangements where surrogacy is undertaken for compensation.

We affirm the lower court's ruling to the extent it holds that the Legislature intended to make void and unenforceable those arrangements that provide both for conception or surrogate gestation services and for the relinquishment of parental rights. The statutory language clearly defines "a surrogate parentage contract" as consisting of two elements: (1) conception, through either natural or artificial insemination, of, or surrogate gestation by a female and (2) her voluntary relinquishment of her parental rights to the child.[1] Only a contract, agreement, or arrangement combining these two elements constitutes a "surrogate parentage contract" that is void and unenforceable under the act.[2]

Section 9 of the act provides that a "surrogate parentage contract" for compensation is unlawful and prohibited.[3] Hence, a contract, agreement, or

---

[1] "Surrogate parentage contract" means a contract, agreement, or arrangement in which a female agrees to conceive a child through natural or artificial insemination, or in which a female agrees to surrogate gestation, and to voluntarily relinquish her parental rights to the child. [MCL 722.853(i); MSA 25.248(153) (i).]

[2] A surrogate parentage contract is void and unenforceable as contrary to public policy. [MCL 722.855; MSA 25.248(155).]

[3] (1) A person shall not enter into, induce, arrange, procure, or otherwise assist in the formation of a surrogate parentage contract for compensation.

(2) A participating party . . . who knowingly enters into a surrogate parentage contract for compensation is guilty of a

arrangement providing compensation solely for conception or surrogate gestation services is not unlawful and prohibited, because the element of "relinquishment of parental rights" is lacking.

We therefore reverse that portion of the lower court's ruling that holds that all surrogate arrangements for compensation are unlawful. Such a reading of the statute is a strained one, because it overlooks the linkage of the elements required to qualify a surrogacy arrangement as a "surrogate parentage contract." Our role is to interpret the act as written by the Legislature and to give effect to the legislative intent as expressed in the language of the act. If the Legislature intended to prohibit surrogate contracts solely on the basis of the existence of compensation for conception or surrogate gestation services, it failed to do so.

To summarize, we hold:

(1) A surrogate parentage contract is void and unenforceable under § 5;

(2) A surrogate parentage contract entered into for compensation is unlawful and prohibited by § 9;

(3) For a surrogate parentage contract to exist there must be present the elements of (1) conception, through either natural or artificial insemination, of, or surrogate gestation by a female and (2) the voluntary relinquishment of her parental rights to the child; and

(4) A contract, agreement, or arrangement that does not contain both elements set forth in (3)

---

misdemeanor punishable by a fine of not more than $10,000.00 or imprisonment for not more than 1 year, or both.

(3) A person other than a participating party who induces, arranges, procures, or otherwise assists in the formation of a surrogate parentage contract for compensation is guilty of a felony punishable by a fine of not more than $50,000.00 or imprisonment for not more than 5 years, or both. [MCL 722.859; MSA 25.248(159).]

above is neither void and unenforceable under § 5 nor unlawful and prohibited by § 9, even when entered into for compensation.[4]

## IV

Lastly, plaintiffs argue that because the state permits surrogacy-for-compensation arrangements where the husband is infertile, the state may not, consistent with equal protection, make it a criminal offense for a married couple, where the wife is infertile, to enter into a surrogacy arrangement that provides for the payment of compensation to the surrogate for conception or surrogate gestation services. Given our holding that the act does not prohibit surrogate contracts that provide compensation solely for conception or surrogate gestation services, there is no need to reach plaintiffs' equal protection argument.

We note that the Legislature has recently passed amendatory language that creates a presumption that every surrogacy contract includes a provision that the surrogate agrees to relinquish her parental rights. 1990 PA 190 amends § 3(i) of the act to read:

"Surrogate parentage contract" means a contract, agreement, or arrangement in which a female agrees to conceive a child through natural or artificial insemination, or in which a female agrees to surrogate gestation, and to voluntarily relinquish her parental *or custodial* rights to the child. *It is presumed that a contract, agreement, or arrangement in which a female agrees to conceive a child through natural or artificial insemination*

---

[4] "Compensation" means a payment of money, objects, services, or anything else having monetary value except payment of expenses incurred as a result of the pregnancy and the actual medical expenses of a surrogate mother or surrogate carrier. [MCL 722.853(a); MSA 15.248(153)(a).]

*by a person other than her husband, or in which a female agrees to surrogate gestation, includes a provision, whether or not express, that the female will relinquish her parental or custodial rights to the child.* [Amendatory language emphasized.]

Obviously, we do not render an opinion concerning the effect of this amendatory language, and nothing in this opinion should be read or construed as doing so.

Affirmed in part and reversed in part.

Jansen, J., concurred.

Murphy, J. *(concurring).* I agree that the Legislature has a compelling governmental interest sufficient to justify its intrusion into the plaintiffs' rights to procreate in the surrogacy context. Further, I concur in the result reached by the majority opinion in this case, in view of how the Legislature originally drafted the Surrogate Parenting Act, MCL 722.851 *et seq.*; MSA 25.248(151) *et seq.* I write separately, however, because I am concerned that this decision might be construed to suggest that the Surrogate Parenting Act, as currently enacted, does not prohibit surrogacy agreements for compensation unless the birth mother agrees to relinquish her parental rights.

At the time of the trial court's decision in this matter, § 3(i) of the act, MCL 722.853(i); MSA 25.248(153)(i), defined a "surrogacy parentage contract" as consisting of an agreement for (1) conception or surrogate gestation and (2) voluntary relinquishment of parental rights. As noted in the majority opinion, however, the Legislature has since amended § 3(i) of the act, through the enactment of 1990 PA 190, to provide additionally a presumption that every surrogacy agreement in

which a female agrees to insemination by a person other than her husband, or in which a female agrees to surrogate gestation, includes a provision that the birth mother will relinquish her parental rights.

On the basis of this amendatory language, I would no longer say, even in the context of this preamendment case, that the Legislature intended that a surrogacy contract that does not contain the element of relinquishment of parental rights by the birth mother is neither void and unenforceable under § 5 of the act, MCL 722.855; MSA 25.248(155), nor unlawful and prohibited by § 9 of the act, MCL 722.859; MSA 25.248(159), when entered into for compensation. Rather, I would simply hold in the context of this preamendment case that at the time of the trial court's decision a contract, agreement, or arrangement that did not include the element of relinquishment of parental rights by the birth mother did not meet the statutory definition of "surrogate parentage contract" as originally defined by the Legislature. I would therefore conclude in the context of this case that, contrary to plaintiffs' challenge, the statute as originally drafted was not void for vagueness. *Kolender v Lawson,* 461 US 352, 357; 103 S Ct 1855; 75 L Ed 2d 903 (1983); *Dep't of Social Services v Emmanuel Baptist Preschool,* 434 Mich 380, 419; 455 NW2d 1 (1990); *Woll v Attorney General,* 409 Mich 500, 533; 297 NW2d 578 (1980).

I further agree with the majority that we need not reach plaintiffs' equal protection arguments, but for the reason that I am unpersuaded by plaintiffs' arguments.