*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KYRESHA LEFEVER,

　　　　　　　Plaintiff-Appellee,

v

LANESHA MATTHEWS,

　　　　　　　Defendant-Appellant.

FOR PUBLICATION
April 1, 2021
9:15 a.m.

No. 353106
Wayne Circuit Court
LC No. 19-103263-DP

Before: GLEICHER, P.J., and K. F. KELLY and RIORDAN, JJ.

RIORDAN, J.

In this child custody case, defendant, Lanesha Matthews, appeals as of right the trial court's order of parentage, custody, and parenting time. The trial court awarded sole legal custody and sole physical custody of plaintiff's and defendant's two minor children to plaintiff, Kyresha LeFever, granted parenting time to defendant, and ordered defendant's name be removed from the children's birth certificates. The custody order was premised on an earlier determination that defendant was merely a third party and not a parent to the children because, although she gestated and birthed the children, she did not have a genetic connection to them, unlike plaintiff whose ova were used in the procreation of the children.

However, we conclude that the trial court improperly interpreted the term "parent" as defined by MCL 722.22(i) in the Child Custody Act ("CCA"), MCL 722.21 *et seq*., as requiring a genetic connection, and misapplied the Surrogate Parenting Act ("SPA"), MCL 722.851 *et seq*. Accordingly, we vacate the trial court's order and remand this case for further proceedings.

## I. FACTS & PROCEDURAL HISTORY

This case arises out of the dissolution of the parties' relationship and subsequent custody dispute over their two minor children, twin girls. Plaintiff and defendant, both women, began a romantic relationship in 2011. At some point during the course of the relationship, they decided to have children together using plaintiff's eggs, fertilized by a sperm donor, and implanted in defendant's womb. The in vitro fertilization resulted in defendant's pregnancy with the twins. Although the parties intended for defendant to give birth in Ohio, where both women could be listed on the birth certificates, defendant gave birth two months early in Michigan. At that time,

-1-

the Michigan Department of Health and Human Services' Division of Vital Records permitted one father and one mother to be listed on a birth certificate. As a result of this practice, defendant was listed as the twins' mother, and although plaintiff was not listed on the birth certificates, the twins were given plaintiff's last name.

The parties cohabitated and parented the twins together until they separated in 2014—before statutes excluding same-sex couples from marriage were declared unconstitutional in *Obergefell v Hodges*, 576 US 644; 135 S Ct 2584; 192 L Ed 609 (2015). The parties continued co-parenting the twins and shared custody until defendant experienced serious health concerns in 2016. At that time, plaintiff became the twins' primary caretaker until 2018 when a custody dispute arose.

In November 2018, plaintiff filed a complaint for custody of the twins as well as a motion to establish interim custody and parenting time. The matter was heard by a referee who determined parentage should first be established. The case was dismissed and resubmitted by plaintiff as a complaint to establish parentage.

The trial court held a hearing to establish plaintiff's standing as a parent. Plaintiff argued that she was the twins' "natural mother" by virtue of her genetic connection to the children, and that defendant, the "gestational surrogate," was merely "the woman who carried the eggs of [plaintiff] and the sperm of an anonymous donor." Plaintiff also raised due process and equal protection arguments. Defendant countered that the SPA applied in such a way that it invalidated any surrogacy contract between the parties. Defendant reasoned that because there is no valid surrogacy contract, she is the twins' "natural parent" by default because she gave birth to them. Defendant further argued that Michigan law provides no avenue for conferring maternity on a party except by way of birth and delivery of a child, and therefore, plaintiff lacked standing to seek custody. Defendant asserted that the parties decided not to have plaintiff recognized as a legal parent to the children at the time of their birth, and that plaintiff must now live with the consequences of that decision.

The trial court found that plaintiff is the twins' "natural and legal mother" and ordered that the birth certificates be amended to add plaintiff. The trial court also awarded joint legal custody on an interim basis and set forth a parenting-time schedule. However, during the course of the preliminary hearing, the trial court raised the issue of defendant's standing as a "natural parent" and ordered additional briefing on the matter. Defendant moved for reconsideration of the trial court's orders, which it denied.

Regarding defendant's standing, plaintiff then argued that defendant was not the twins' natural parent because she shared no genetic connection with them. In response, defendant maintained her position that her biological connection to the twins, by way of gestation, made her the twins' natural parent too. Defendant argued that neither the statute, nor the dictionary definition, limit "natural parent" to mean only a genetic parent, and such a narrow interpretation of the term is antithetical to the purpose of the CCA and would violate her constitutional rights to substantive due process and equal protection. Defendant also argued that she has "standing by agreement" by way of the parties' co-maternity arrangement and that plaintiff's action to revoke defendant's parentage of the twins was barred by the limitations period set forth in the Revocation of Paternity Act ("ROPA"), MCL 722.1437(1).

The trial court concluded that the SPA applied to the facts of this case because it broadly defines a surrogate parentage contract as encompassing any arrangement in which a female agrees to conceive a child through artificial insemination, or in which a female agrees to surrogate gestation. The trial court further reasoned that the SPA identifies the "mother" as a party with a genetic connection to the child, whereas a "surrogate carrier" gestates and births a child to whom she has no genetic relationship. The trial court recognized that the SPA does not indicate which party should have custody to the resultant offspring, but rather directs court to apply the CCA.

The trial court noted that this case presents a matter of first impression in Michigan, but it considered the various outcomes in other jurisdictions under similar factual circumstances. The trial court was persuaded by the public policy rationale in *Belsito v Clark*, 67 Ohio Misc 2d 54; 644 NE2d 760 (1994). The trial court considered the Acknowledgment of Parentage Act, MCL 722.1003, the Safe Delivery of Newborns Act, MCL 712.1 *et seq.*, the Adoption Code, MCL 710.21, and finally the CCA, which defines a parent as "natural" or "adoptive," MCL 722.22(i). The trial court concluded that "the [L]egislature of this state has established that it is the public policy of this state to identify a parent as a person with a biological connection to the child." In this case, the trial court concluded that plaintiff, by way of her genetic connection to the twins, was the only party to establish such a biological connection. As a result, this finding created a presumption that the best interests of the twins were served by awarding plaintiff custody, while the SPA granted defendant standing as a third party.

Defendant sought leave to appeal to this Court, but the application was dismissed for lack of jurisdiction because the opinion issued by the trial court was not a decision on a dispositive motion. *LeFever v Matthews*, unpublished order of the Court of Appeals, entered October 23, 2019 (Docket No. 351133). Accordingly, the matter progressed to trial where defendant was required to show by clear and convincing evidence that it was in the twins' best interest for her to have custody.

After a six-day trial, the court concluded that defendant failed to carry her burden to establish parentage. Plaintiff was awarded full legal and physical custody and the trial court ordered that defendant's name be removed from the twins' birth certificates. However, the trial court granted parenting time to defendant pursuant to her standing as a third party under MCL 722.271(b). Defendant now appeals and challenges the trial court's finding that she is not a natural parent. She argues that the trial court misinterpreted the CCA when it found that she is not a "natural parent," that it misapplied the SPA to the facts of this case, and that the trial court's order implicates her federal constitutional rights to substantive due process and equal protection under the law.

## II. STANDARDS OF REVIEW

Legal standing constitutes a question of law that we review de novo. *Heltzel v Heltzel*, 248 Mich App 1, 28; 638 NW2d 123 (2001). As it relates specifically to "the resolution of a child custody dispute," the CCA provides that "all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28. A clear legal error occurs when the circuit court incorrectly chooses, interprets, or applies the law. *Kubicki v Sharpe*, 306 Mich App 525, 538; 858 NW2d 57 (2014); *Fletcher v Fletcher*, 447 Mich

871, 881; 526 NW2d 889 (1994). We review matters of statutory interpretation and constitutional issues de novo. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008); *In re MKK*, 286 Mich App 546, 556; 781 NW2d 132 (2009).

## III. THE CHILD CUSTODY ACT OF 1970

Defendant first argues that the trial court committed error requiring reversal when it concluded that she was not a "natural parent" under the CCA because she lacked a genetic connection to the twins. We agree.

The CCA governs custody, parenting time, and child support issues for minor children in Michigan and it is the exclusive means of pursuing child custody rights. MCL 722.24(1); *Aichele v Hodge*, 259 Mich App 146, 153; 673 NW2d 452 (2003). It is "equitable in nature," and must be "liberally construed and applied to establish promptly the rights of the child and the rights and duties of the parties involved." MCL 722.26(1). The CCA contains the following parental presumption:

> If a child custody dispute is between the parents, between agencies, or between third persons, the best interests of the child control. If the child custody dispute is between the parent or parents and an agency or a third person, the court shall presume that the best interests of the child are served by awarding custody to the parent or parents, unless the contrary is established by clear and convincing evidence. [MCL 722.25(1).]

"Parent" is defined as "the natural or adoptive parent of a child." MCL 722.22(i). However, determining whether the term "natural parent" is elastic enough to include defendant is a matter of statutory interpretation. To that end, we consider the following principles:

> The judiciary's objective when interpreting a statute is to discern and give effect to the intent of the Legislature. First, the court examines the most reliable evidence of the Legislature's intent, the language of the statute itself. When construing statutory language, the court must read the statute as a whole and in its grammatical context, giving each and every word its plain and ordinary meaning unless otherwise defined. Effect must be given to every word, phrase, and clause in a statute, and the court must avoid a construction that would render part of the statute surplusage or nugatory. If the language of a statute is clear and unambiguous, the statute must be enforced as written and no further judicial construction is permitted. Generally, when language is included in one section of a statute but omitted from another section, it is presumed that the drafters acted intentionally and purposely in their inclusion or exclusion. The courts may not read into the statute a requirement that the Legislature has seen fit to omit. When the Legislature fails to address a concern in the statute with a specific provision, the courts cannot insert a provision simply because it would have been wise of the Legislature to do so to effect the statute's purpose. Statutes that address the same subject matter or share a common purpose are *in pari materia* and must be read collectively as one law, even when there is no reference to one another. [*In re Jajuga Estate*, 312 Mich App 706, 712; 881 NW2d 487 (2015), quoting *Book–Gilbert v Greenleaf*, 302 Mich App 538,

541–542; 840 NW2d 743 (2013) (brackets omitted).]

The term "natural parent" is not defined by the statute. However, we have previously interpreted the term to mean a blood relation. *Stankevich v Milliron (On Remand)*, 313 Mich App 233, 236; 882 NW2d 194 (2015), (hereinafter, *Stankevich III*) (citing Random House Webster's College Dictionary (2005) definition of "natural"). A blood relation is different from relation by affinity or adoption, and the term "natural parent" as defined in the CCA does not include those relationships. This is supported by the inclusion of the term "adoptive parent" as a separate category from "natural parent" within the same subsection, MCL 722.22(i). Thus a "parent" within the meaning of the CCA does not include relations such as step-parents (who are related to a child by marriage or affinity), foster parents (whose relationship to a child is determined and controlled by the agency foster/parent agreement), or grandparents (who may be related to a child by consanguinity, but are removed in their relation by one degree). Such parties are "third persons." See MCL 722.22(k) (defining "third person" as "an individual other than a parent"); *In re Anjoski*, 283 Mich App 41, 52; 770 NW2d 1 (2009) (considering a step-parent as a third party); *Tallman v Milton*, 192 Mich App 606; 482 NW2d 187 (1992) (considering foster parents as third parties); *Bowie v Arder*, 441 Mich 23, 48–49; 490 NW2d 568 (1992) (considering a grandparent as a third party). Here, defendant's relationship to the twins as their birth mother has a closer biological connection than a step-parent or foster parent, and even that of a grandparent because she is related to the twins in a closer degree than a grandparent as defendant gave birth to the children.

Moreover, when interpreting an undefined statutory term, the term "must be accorded its plain and ordinary meaning." *Brackett v Focus Hope, Inc*, 482 Mich 269, 276; 753 NW2d 207 (2008). Consulting a lay dictionary is proper when defining common words or phrases that lack a unique legal meaning, but when the statutory term is a legal term of art, the term must be construed in accordance with its peculiar and appropriate legal meaning. *Id*. *Black's Law Dictionary* (11th ed 2019) does not define "natural parent," but it defines "blood relative" as "[s]omeone who shares an ancestor with another." In addition, the entry for "genetic parent" refers to the definition for "biological parent" which is "[t]he woman who provides the egg . . . to form the zygote that grows into an embryo." "Birth parent" is defined as "[e]ither the biological father or the mother who gives birth to the child." Thus, plaintiff meets the definition of "biological parent" and "genetic parent" and defendant satisfies the definition of a "birth parent." However, those terms are not included in the definition of "blood relative" or otherwise mention the term "natural parent."

Accordingly, we must consider the lay dictionary definition as we did in *Stankevich III*, 313 Mich App at 236.[1] We have found no dictionary definition for "natural parent," but, building

---

[1] In that case, the parties were a same-sex couple that had been married in Canada in 2007. *Stankevich III*, 313 Mich App at 233. Using artificial insemination, the defendant became pregnant and gave birth before the parties separated in 2009 and a subsequent custody complaint was filed. *Id.* It was undisputed that the defendant was the biological parent to the child. *Id.* Rather, the issue before us concerned the application of the equitable-parent doctrine which recognizes that " 'a person who is not the biological father of a child may be considered a parent against his will, and consequently burdened with the responsibility of the support for the child,' such a person, in

-5-

off our analysis in *Stankevich III*, we consider the various dictionary definitions of "blood relation," and conclude that they merely differentiate between relation by birth and adoption. See *American Heritage Dictionary of the English Language* (5th ed) (defining "blood relation" as "a person who is related to another by birth rather than by marriage"); *Merriam-Webster Online Dictionary* (defining "blood relative" as "someone who has the same parents or ancestors as another person"); *MacMillan Dictionary Online* (defining "blood relation" as "someone that you are related to by birth, rather than by marriage"); *Cambridge Dictionary Online* (defining "blood relation" as "someone who is related to you by birth rather than through marriage"). Thus, the textual clues indicate that the term "natural parent" is elastic enough to include defendant, who, although she has no genetic connection to the twins, is related to them by birth rather than through marriage.[2]

In concluding otherwise, the trial court erroneously considered the genetic requirements in other family-law statutes, namely, the Acknowledgment of Parentage Act, MCL 722.1003, the Safe Delivery of Newborns Act, MCL 712.1 *et seq.*, and the Adoption Code, MCL 710.21. "However, the first step of statutory interpretation is to review the language of the statute at issue, not that of another statute." *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Michigan*, 492 Mich 503, 521; 821 NW2d 117 (2012). Although a statute must be read in conjunction with other

---

being treated as a parent, may also seek the rights of custody or parenting time." *Id.* at 238, quoting *Atkinson v Atkinson*, 160 Mich App 601, 608–609; 408 NW2d 516 (1987).

Initially, we concluded that the equitable-parent doctrine was inapplicable to the case because in *Van v Zahorik*, 460 Mich 320, 330–331; 597 NW2d 15 (1999), the Michigan Supreme Court had declined to extend application of the doctrine outside the context of marriage, and because at the time of the appeal Michigan did not recognize same-sex marriage, the doctrine was inapplicable to the facts of that case. *Stankevich v Milliron*, unpublished opinion per curiam of the Court of Appeals, issued October 17, 2013 (Docket No. 310710), p 1, (hereinafter *Stankevich I*) vacated and remanded 498 Mich 877; 868 NW2d 907 (2015) (hereinafter *Stankevich II*). While appeal from *Stankevich I* was pending, the United States Supreme Court issued its decision in *Obergefell*, 576 US 644, which struck down as unconstitutional Michigan's statute that prohibited same-sex marriage. Accordingly, the Michigan Supreme Court vacated *Stankevich I* and remanded the case to the Court of Appeals for reconsideration in light of *Obergefell*. On remand, we maintained our interpretation of the term "natural parent" but concluded that the plaintiff was not barred from asserting the equitable-parent doctrine and we remanded the matter to the trial court for an evidentiary hearing regarding the validity of the marriage and the other disputed factual issues *Stankevich III*, 313 Mich App at 240-242.

[2] The concurrence criticizes us for relying on dictionaries, rather than the common law, to ascertain the meaning of "natural parent." However, the CCA is "a comprehensive statutory scheme" concerning child-custody matters. See *Van*, 460 Mich at 327. "In general, where comprehensive legislation prescribes in detail a course of conduct to pursue and the parties and things affected, and designates specific limitations and exceptions, the Legislature will be found to have intended that the statute supersede and replace the common law dealing with the subject matter." *Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 74; 711 NW2d 340 (2006). Our duty is therefore to address the comprehensive statutory language of the CCA.

relevant statutes and interpreted in a manner that ensures that it works in harmony with the entire statutory scheme, *Potter v McLeary*, 484 Mich 397, 411; 774 NW2d 1 (2009), none of these statues were implicated by the facts of this case.

In addition, a review of these statutes does not support the trial court's conclusion that Michigan law generally requires a genetic connection in order to establish maternity. Specifically, the trial court concluded that "MCL 722.1003, Michigan's Acknowledgment of Parentage Act has clearly identified that only a biological parent will have the 'duties of a child-parent relationship and legal status of [a] natural parent'." However, the act establishes paternity (not maternity). MCL 722.1004. The act defines the term "father" but not the term "mother." MCL 722.1002. Moreover, the act defines "father" as "the man who signs an acknowledgment of parent of a child." MCL 722.1002(d). This definition does not hint at any legal requirement of a genetic connection between a parent and a child. In fact, "[n]othing in the Acknowledgement of Parentage Act requires that the man completing the acknowledgement form actually be the child's biological father." *In re Daniels Estate*, 301 Mich App 450, 456; 837 NW2d 1 (2013). MCL 722.1007(g)(*i*) expressly provides that the acknowledgement form must include notice that signing the form waives blood or genetic tests to determine if the man is the biological father of the child. The only indication in the act as to how maternity is determined is found in MCL 722.1002(b) which defines the term "child" as "a child conceived and born to a woman . . . ." This definition does not include any requirement that the child be conceived by the same woman who births the child, nor does it indicate any preference for a genetic parent to take priority over a birth parent. Although MCL 722.1437 permits for the revocation of acknowledgment of parentage, "[n]othing in the act indicates that DNA results, standing alone, are sufficient to require revocation of an acknowledgment of parentage." *Helton v Beaman*, 304 Mich App 97, 108; 850 NW2d 515 (2014).

The Safe Delivery of Newborns Act states that a party petitioning for custody of a newborn may be ordered to submit to genetic testing "[u]nless the birth was witnessed by the emergency service provider and sufficient evidence exists to support maternity." MCL 712.11(2). Thus, it appears that the act only contemplates scenarios when a birth mother is also the genetic mother, and is uninformative as to the statutory construction of the CCA in this case.

The trial court's reliance on the Adoption Code is also misplaced. The act does not define or otherwise address genetic parents or birth parents. In addition, the trial court did not consider the Genetic Parentage Act, MCL 722.1461 *et seq.*, which permits a man to establish paternity by way of blood, tissue, or genetic testing. MCL 722.1467. The act focuses on a genetic parent-child connection, but considering it in the context of the entire statutory scheme, it does not support a conclusion that the Legislature intended for genetics to be the only way to establish parentage. Rather, "[t]he Legislature has provided numerous statutory paths to establishing paternity." *In re MKK*, 386 Mich App at 557. There is no indication in the plain language of any of these statutes that the Legislature intended to limit the path to establishing maternity to the single route of demonstrating a genetic connection.

In addition, the trial court relied on the public policy rationale provided in *Belsito v Clark*, 67 Ohio Misc 2d 54. We do not find this case by the Ohio Court of Common Pleas to be persuasive. In that case, the plaintiffs, Anthony and Shelly Belsito, a heterosexual married couple, used in vitro fertilization to combine their own genetic material and produce an embryo which was implanted into a surrogate, Carol Clark (Shelly's younger sister). *Id.* Before the child was born, the local

hospital informed Shelly that, in accordance with Ohio law, Carol would be listed on the birth certificate as the child's mother, and because Carol was not married to the child's father, Anthony, the child would be considered illegitimate. *Id.* Thereafter, Shelly, along with Anthony, sought a declaratory order recognizing that they were the child's legal and natural parents. *Id.* The court concluded that, although both Shelly and Carol would be considered legal mothers under the language of the applicable Ohio statutes, society would be served best by a determination that only one woman was the child's mother. *Id.*

On public policy grounds, the Ohio court rejected the "intent test" adopted by California courts whereby parentage was awarded to the "intended parent." *Id.* Instead, the court, without reliance on any legal authority, concluded that in such cases, genetics wins out over gestation because the "genetic parent can guide the child from experience through the strengths and weaknesses of a common ancestry of genetic traits." *Id.* at 64. However, our Supreme Court has stated that "[i]t is not within the authority of the judiciary 'to redetermine the Legislature's choice or to independently assess what would be most fair or just or best public policy.' " *Lash v City of Traverse City*, 479 Mich 180, 197; 735 NW2d 628 (2007), quoting *Hanson v Mecosta Co Rd Comm'rs*, 465 Mich 492, 504; 638 NW2d 396 (2002).

Therefore, we vacate the trial court's final order and remand this case for the trial court to consider custody and parenting time with both parties as "natural parents" under the CCA.

## IV. THE SURROGATE PARENTING ACT

Defendant also argues that the trial court erred when it concluded that the SPA applies to the facts of this case. We agree but conclude that the trial court's misapplication of the law does not require reversal.[3]

---

[3] At the outset, we note that defendant has waived this issue by initially arguing that the SPA *applies* during the May 7, 2019 hearing on plaintiff's standing in the trial court. Now on appeal, defendant reverses course and argues that the trial court erred when it concluded that the SPA applies. Waiver is a voluntary and intentional abandonment of a known right. *Braverman v Granger*, 303 Mich App 587, 608; 844 NW2d 485 (2014). "A party cannot stipulate [to] a matter and then argue on appeal that the resultant action was error." *Holmes v Holmes*, 281 Mich App 575, 588; 760 NW2d 300 (2008) (quotation marks and citation omitted). "A party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error." *The Cadle Co v City of Kentwood*, 285 Mich App 240, 255; 776 NW2d 145 (2009). To allow a party to assign error on appeal to something that he or she deemed proper in the lower court would be to permit that party to harbor error as an appellate parachute. *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). Although an issue is waived, we "may overlook the preservation requirements if the failure to consider the issue would result in manifest injustice, if consideration is necessary for a proper determination of the case, or if the issue involves a question of law and the facts necessary for its resolution have been presented." *Johnson Family Ltd Pship v White Pine Wireless, LLC*, 281 Mich App 364, 377; 761 NW2d 353 (2008) (internal quotation marks and citation omitted). Moreover, when the trial court "incorrectly

The SPA, MCL 722.851 *et seq.*, governs surrogacy agreements. MCL 722.855 renders invalid surrogate parentage contracts. MCL 722.853(i) defines "surrogate parentage contract" as follows:

> a contract, agreement, or arrangement in which a female agrees to conceive a child through natural or artificial insemination, or in which a female agrees to surrogate gestation, and to *voluntarily relinquish her parental or custodial rights to the child*. It is presumed that a contract, agreement, or arrangement in which a female agrees to conceive a child through natural or artificial insemination by a person other than her husband, or in which a female agrees to surrogate gestation, includes a provision, whether or not express, that the female will relinquish her parental or custodial rights to the child. [Emphasis added.]

In turn, "surrogate gestation" means "the implantation in a female of an embryo not genetically related to that female and subsequent gestation of a child by that female." MCL 722.853(g). In addition, MCL 722.861 provides:

> If a child is born to a surrogate mother or surrogate carrier pursuant to a surrogate parentage contract, and there is a dispute between the parties concerning custody of the child, the party having physical custody of the child may retain physical custody of the child until the circuit court orders otherwise. The circuit court shall award legal custody of the child based on a determination of the best interests of the child. As used in this section, "best interests of the child" means that term as defined in [the CCA, MCL 722.23].

There is no doubt that the parties had an arrangement, though not at arm's length, for plaintiff to provide the eggs and for defendant to carry and birth the twins. However, we have previously explained that the voluntary relinquishment of parental rights is a necessary element to finding that a surrogate parentage contract exists:

> The statutory language clearly defines "a surrogate parentage contract" as consisting of two elements: (1) conception, through either natural or artificial insemination, of, or surrogate gestation by a female and (2) her voluntary relinquishment of her parental rights to the child. Only a contract, agreement, or arrangement combining these two elements constitutes a "surrogate parentage contract" that is void and unenforceable under the act.

*   *   *

To summarize, we hold:

---

chooses, interprets, or applies the law, it commits legal error that the appellate court is bound to correct." *Fletcher*, 447 Mich at 881. Accordingly, we address defendant's argument on appeal.

(1) A surrogate parentage contract is void and unenforceable under § 5;

\* \* \*

(3) For a surrogate parentage contract to exist there must be present the elements of (1) conception, through either natural or artificial insemination, of, or surrogate gestation by a female and (2) the voluntary relinquishment of her parental rights to the child; and

(4) A contract, agreement, or arrangement that does not contain both elements set forth in (3) above is neither void and unenforceable under § 5 nor unlawful and prohibited by § 9, even when entered into for compensation. [*Doe v Attorney Gen*, 194 Mich App 432, 441-443; 487 NW2d 484 (1992) (footnotes omitted).]

MCL 722.853(i) does not state that the presumption of relinquishment of parental rights is conclusive,[4] but it also does not indicate what level of proof is required to rebut the presumption of relinquishment. Thus, we must use the "the usual standard required to overcome a rebuttable presumption: competent and credible evidence." *Reed v Breton*, 475 Mich 531, 539; 718 NW2d 770 (2006). In addition, where the statute does not specify the standard of proof, the usual civil "preponderance of the evidence" quantum of proof applies. *Mayor of Cadillac v Blackburn*, 306 Mich App 512, 521-522; 857 NW2d 529 (2014); *Residential Ratepayer Consortium v Pub Serv Comm*, 198 Mich App 144, 149; 497 NW2d 558 (1993).[5]

The trial court did not make any finding on whether the evidence in this case successfully rebutted the statutory presumption of relinquishment of parental rights set forth in MCL 722.853(i). However, the parties testified that they intended to co-parent the twins and the clinic forms which were filled out at the time of the in vitro fertility treatments state that the parties intended a co-maternity arrangement. In any event, the trial court does not need to consider this issue on remand because, even assuming the SPA applies, MCL 722.861 of the SPA directs the trial court to consider the best-interest factors as set forth in the CCA when determining custody.[6]

---

[4] A statutory conclusive presumption may not be rebutted by other evidence. *Pearo v Mackinac Island*, 307 Mich 290; 11 NW2d 893 (1943). In the absence of any language indicating that a statutory presumption is conclusive, we will decline to make such an inference. *Maier v General Telephone Company of Michigan*, 247 Mich App 655; 637 NW2d 263 (2001).

[5] MRE 301, entitled "Presumptions in Civil Actions and Proceedings," explains the effect of rebuttable presumptions:

> In all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

[6] MCL 722.861 states:

Notably, the SPA does not indicate that the surrogate mother is a third party under the CCA, nor does it cross-reference any other provision of the CCA. Nor does MCL 722.23 (the CCA's best-interest factors) cross-reference MCL 722.25(1) (the parental presumption provision of the CCA). But, because the CCA is the exclusive means of pursuing child custody rights,[7] there is no reason to conclude that MCL 722.25(1), which provides that the best interests of the child are served by awarding custody to the child's parent or parents unless there is clear and convincing evidence to the contrary, is inapplicable. In other words, even if the SPA applies, defendant remains a "natural parent" under the CCA, as discussed above, and the trial court's erroneous conclusion that the SPA applies does not alter the outcome of the case.

## V. CONSTITUTIONAL CLAIMS

Defendant also argues that the trial court's order violates her constitutional rights under the Equal Protection Clause and Due Process Clause of the United States Constitution.[8] However, because we conclude that the trial court erred in interpreting the CCA and misapplied the SPA in this case, we need not address defendant's remaining constitutional arguments. See *Dep't of Health & Human Services v Genesee Circuit Judge*, 318 Mich App 395, 407; 899 NW2d 57 (2016) (the widely accepted and venerable rule of constitutional avoidance counsels that we first consider whether statutory or general law concepts are instead dispositive).

## VI. CONCLUSION

The trial court erred when it concluded that defendant is not a "natural parent" under the CCA because she lacks a genetic link to the twins that she carried through gestation and birthed.[9]

---

If a child is born to a surrogate mother or surrogate carrier pursuant to a surrogate parentage contract, and there is a dispute between the parties concerning custody of the child, the party having physical custody of the child may retain physical custody of the child until the circuit court orders otherwise. The circuit court shall award legal custody of the child based on a determination of the best interests of the child. As used in this section, "best interests of the child" means that term as defined in [MCL 722.23].

[7] *Aichele*, 259 Mich App at 153.

[8] See US Const, Am XIV.

[9] We conclude that the term "natural parent" is elastic enough to include both parents in this case, where the parties divided the female reproductive roles of conceiving a child so that each has assumed a function traditionally used to evidence a legal maternal relationship. However, we note that the advent of assisted reproductive technology has complicated an area of law that traditionally was fairly straightforward. The statutes at play in this case, specifically the Child Custody Act of 1970, MCL 722.21 *et seq*., and the Surrogate Parenting Act ("SPA"), MCL 722.851 *et seq*. (first passed in 1988, 1988 PA 199) were written and enacted in an era when modern forms of assisted reproductive technology that are commonly used today were considered science fiction, and the cutting-edge technology being developed now was unimaginable then. Certainly, the common law could not have anticipated the fairly common circumstances of the parties in this case, let alone the circumstances of families where one child has three genetic parents, or where a child is

-11-

Accordingly, we vacate the custody order and remand this case to the trial court for a new custody hearing where both parties are considered parents.

/s/ Michael J. Riordan
/s/ Kirsten Frank Kelly

produced from the DNA of one egg fertilizing a second egg, or where a child has two genetic fathers and no genetic mother. Our current statutory schemes are poor vehicles for modern-made families to seek relief, and we question whether they are robust enough in their current form to provide equitable outcomes to such families. These new technologies have thrown a wrench into the legal understanding of parentage and have given rise to novel issues in contract law, insurance coverage, immigration law, and estate planning. Accordingly, we anticipate that the Legislature will need to modernize the law to keep pace with technological advancements and appropriately balance various public policy concerns.